**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| LEE W. MUELLER, BOYCE HYDRO POWER, LLC, BOYCE HYDRO, LLC, and BOYCE MICHIGAN, LLC | ) ) ) ) |
| *Plaintiffs* | ) ) |
| | )   Civil Action No. |
| v. | ) ) |
| MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES & ENERGY, MICHIGAN DEPARTMENT OF NATURAL RESOURCES, and BRIAN RUDOLPH, DAVID PINGEL, and KYLE KRUGER,  INDIVIDUALLY | ) ) ) ) ) ) ) ) |
| *Defendants* | ) ) |

**COMPLAINT FOR MONETARY DAMAGES**
**AND EQUITABLE AND DECLARATORY RELIEF**
**PRELIMINARY STATEMENT**

1.      Plaintiffs bring this federal action for monetary damages and declaratory relief to vindicate their constitutionally protected liberty and property rights and interests under Article IV, § 2, clause 1 of, and under the Fifth, Eighth and Fourteenth Amendments to, the United States Constitution.  These rights, interests, immunities and privileges are implicit in and fundamental to the concept of ordered liberty and *our* scheme of ordered liberty, with deep roots in *our Nation's* history and tradition.

2.      Plaintiffs have been systematically and routinely deprived of their protected liberty and property rights and interests by the politically unaccountable environmental and natural resource-focused administrative agencies of the State of Michigan, and more specifically, by the arbitrary, capricious and "shock-the-conscience" conduct of their high officials.  These agencies and officials have knowingly and aggressively applied and enforced

1

environmental and natural resources laws, regulations and policies that are mostly postmodern, international, and from *outside* the borders of *our* Nation, and which, contrary to concepts of ordered liberty, especially private property, do *not* have deep roots in *our* Nation's history and tradition.

3.      Plaintiffs humbly appeal to this Court out of necessity in order to secure justice, fairness and equity, which Plaintiffs are certain they will not receive once Defendants file their imminent multimillion dollar lawsuit against Plaintiffs based on alleged state common law tort and strict statutory liability principles, irrespective of federal preemption, and without having first accorded Plaintiffs either substantive or procedural due process of law and equal protection under the law.  In particular, the State has threatened to file this imminent lawsuit without having first provided any validated scientific or other technical evidence demonstrating that Plaintiffs' conduct resulted in the millions of freshwater mussels allegedly killed, and relevant and reliable evidence that demonstrate the State agencies had employed proven and tested scientific methodologies, protocols and procedures to ensure the accuracy of their findings. Finally, Plaintiffs were recently informed that Defendants' imminent multimillion dollar lawsuit will seek monetary damages/fines totaling in the *hundreds of millions of dollars*, which is clearly excessive and punitive in nature, and contrary to Plaintiff's constitutionally protected private property rights.

## JURISDICTION AND VENUE

4.      This Court has original subject matter federal question jurisdiction over these claims, pursuant to 28 U.S.C. § 1331, because they arise under the Constitution and laws of the United States, including the Federal Power Act (16 U.S.C. §§ 797(e), 803(a)-(c) , and 821) and the Endangered Species Act (16 U.S.C. §§ 1532(3)   and 1532(19);   1533(a)(1)(A),

1533(a)(3)(A)(i), 1533(b)(2)-(3); 1538(a)(1)(C); 1540(a)(1)). The federal rights asserted by Plaintiffs are enforceable under 42 U.S.C. § 1983.

5.     This Court has original subject matter diversity jurisdiction over these claims with respect to the Plaintiff individual, a non-Michigan resident, pursuant to 28 USC § 1332(a)(1), because the amount in controversy exceeds $75,000.

6.     This Court has original subject matter jurisdiction over these claims pursuant to 28 USC § 1343(a)(3) with respect to the constitutionally protected civil rights of the non-individual Plaintiffs which have been violated.

7.     This Court also has supplemental jurisdiction over Defendants' imminent State law claims pursuant to 28 U.S.C. § 1367(a).

8.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and 65.

9.     Venue is proper in the Western District of Michigan under 28 U.S.C. § 1391, where Defendant State agencies' primary offices are located and where at least one of the individual Defendants is believed to reside.

## ARTICLE III STANDING

10.     Plaintiffs suffered an injury-in-fact which is concrete, particularized and actual, when their constitutionally protected rights, privileges and interests were violated, and there is a substantial risk that further imminent harm will occur.

## PARTIES

11.      Plaintiff Lee W. Mueller ("Mueller") is a resident and domiciliary of the State of Nevada.  Since March 2007, he has served as the principal Co-Member Manager solely responsible for the operations of the Plaintiff entities.

12.     Plaintiff Boyce Hydro Power, LLC ("BHP") is a Michigan Limited Liability Company duly registered with the State of Michigan to conduct business in the State of Michigan.  BHP holds Federal Energy Regulatory Commission ("FERC") licenses to operate hydroelectric dams located in Gladwin and Midland Counties in the State of Michigan.  From July 12, 2007, through September 24, 2018, Plaintiff BHP held the FERC license to operate the Edenville Hydroelectric Project No. 10808 ("Edenville Project"), including the Edenville Dam which impounds the Wixom Reservoir located in Gladwin County, Michigan.  Pursuant to Section 3(11) of the Federal Power Act (16 U.S.C. § 796(11)) and its FERC license, BHP, during the term of the Edenville Project FERC license, indirectly acquired and held sufficient rights to use all bottomlands located within the boundaries of Edenville Hydroelectric Project No. 10808, including the bottomlands of the impounded Wixom Reservoir and the bottomlands of the Tittabawassee and Tobacco Rivers located upstream from the Edenville Project.

13.     Plaintiff Boyce Hydro LLC ("BH") is a Michigan Limited Liability Company duly registered with the State of Michigan to conduct business in the State of Michigan.  BH operated the Edenville Project, on behalf of BHP, during the term of BHP's FERC license for the project which ended on September 24, 2018.  From September 25, 2018 to the present, BH has continued to operate the Edenville Dam without regard to hydroelectric generation.  Edenville Dam is a 95-year-old embankment dam which the FERC had considered potentially unsafe because of the risk of catastrophic erosion from overtopping due to its allegedly inadequate spillway capacity, and the high hazard potential rating it had been assigned (since its failure or mis-operation could pose a significant risk to downstream communities in Midland County, Michigan).

14.    Plaintiff Boyce Michigan, LLC ("BM") is a Michigan Limited Liability Company duly registered with the State of Michigan to conduct business in the State of Michigan. BM acquired and managed, on behalf of BHP, during the term of BHP's FERC license for the Edenville Project, the Wixom Reservoir and Tittabawassee and Tobacco River bottomlands falling within the boundaries of the Edenville Hydro Project.

15.    Plaintiffs BHP, BH and BM will hereafter be collectively referred to as "Boyce".

16.    Defendant Michigan Department of Environment, Great Lakes and Energy ("EGLE"), known as the Michigan Department of Environmental Quality ("MDEQ") prior to an April 22, 2019 reorganization, is the state agency that is charged with protecting Michigan's environment and public health *inter alia* by managing water resources.  The Water Resource Division ("WRD") of EGLE ("EGLE-WRD") is charged with ensuring Michigan's water resources remain clean and abundant *inter alia* by monitoring water quality, and the health of aquatic communities, developing policy, and protecting, restoring and conserving Michigan's inland lakes, streams and wetlands.  The Dam Safety Unit of EGLE-WR ("EGLE-WR-DS") is responsible for ensuring the safety of Michigan's state-regulated dams.  The EGLE-WR-DS program focuses on ensuring that dams are properly constructed, inspected and maintained, and that the owners have adequately prepared for potential emergencies.  The EGLE-WR-DS program has only two full-time staff members, plus one staff supervisor-hydrologist, dedicated to overseeing the regulation and safety of 1,061 dams within the State of Michigan, 89 of which bear a "high" hazard potential rating (as of 2018), and two-thirds of which have reached their typical 50-year design life, with a program budget of approximately only $400,000.

17.    Defendant Michigan Department of Natural Resources ("MDNR") is the state agency that is charged with ensuring the conservation, protection, management, and use of the

state's natural resources for current and future generations. The Fisheries Division of MDNR is responsible for protecting and managing the state's aquatic resources, including fish populations, other aquatic life and aquatic habitat, which are held in trust for all Michigan citizens. The webpage of the MDNR's Fisheries Division Habitat Unit contains a link to a list of habitat conservation projects engendering the removal of 14 dams located in Michigan, and the webpage containing MDNR's "Special/Management Reports contains a 2009 assessment of the Tittabawassee River (Special Report 52) which frequently mentions dam removal as a preferred option for solving fish habitat "problems" and restoring original river functionality, and which specifically mentions both Edenville Dam and Defendant Kyle Kruger.

18. Defendant Brian Rudolph ("Rudolph") has served as District Supervisor of EGLE-WRD in the Saginaw Bay District Office since 2009. In this role, Rudolph has been responsible *inter alia* for the administration, compliance and enforcement activities of EGLE's wetland protection, inland lakes and streams, Great Lakes shorelands, environmental areas, high risk erosion and floodplain development programs throughout the 12-county Bay City District.

19. Defendant David Pingel ("Pingel") has served, since February 2018, as the Supervisor of the Enforcement Unit of the statewide EGLE-WRD Field Operations Support Section. In this role, he supervises EGLE-WRD Enforcement Unit employees involved in administrative and judicial actions brought under a variety of statutes EGLE-WRD administers.

20. Defendant Kyle Kruger ("Kruger") is a Senior Fisheries Biologist in the Habitat Management Unit of Defendant MDNR. Kruger's responsibilities have included stream and habitat restoration work. However, Kruger's primary work has been monitoring compliance with federal hydro projects in the State of Michigan, which involves his frequent interaction

with FERC and consulting with the U.S. Fish and Wildlife Service ("USFWS") on related and overlapping FERC licensing and U.S. Endangered Species Act issues.

## **RELEVANT FACTS**

21.     From at least August 6, 1993 until September 24, 2018, FERC had repeatedly, in a series of correspondences and orders, emphasized the potentially unsafe condition of the Edenville Dam, a 95-year-old earthen embankment structure. Specifically, FERC expressed its concerns about the risk of catastrophic erosion from overtopping due to inadequate spillway capacity (i.e., only approximately 50% of the federally mandated Probable Maximum Flood ("PMF") standard), and the high hazard potential rating it had been assigned because its failure, or mis-operation, could pose a significant risk to the Village of Sanford, Northwood University, the City of Midland, and other downstream areas. These risks have remained virtually the same before and after the effective date of the FERC license revocation for the Edenville Project.

22.     Beginning on September 20, 2018, while the FERC license for Plaintiff Boyce's Edenville Dam and the Michigan Natural Resources and Environmental Protection Act ("NREPA") exemption applicable to drawdowns remained in effect, Plaintiff Boyce proceeded to drawdown the Wixom Reservoir to perform dam safety-related "focused spillway and gate assessments" at the upstream FERC-licensed Smallwood Hydroelectric Project operated by a Boyce affiliate. This drawdown of the upstream impoundment created by the Edenville Dam was required in response to a FERC order issued to all high hazard dams as a consequence of the aftermath of the emergency spillway failure at the 2017 Oroville Dam in California. The focused spillway inspection was conducted by Boyce engineering consultants and was

performed in accordance with the conditions set forth in Article 404 of the Edenville Dam FERC license, as modified by the variances FERC subsequently granted in its orders of September 14, 2018 and September 19, 2018.

23.     Boyce completed the FERC-ordered 2018 drawdown of the Wixom Reservoir for the express purpose of inspecting the otherwise submerged portions of the upstream Smallwood Dam tailrace spillway slab and footings of its concrete side retaining walls. The drawdown was achieved on the October 1, 2018 scheduled inspection date. When completed, the drawdown, which proceeded at a daily rate of up to 0.7 feet (8.4 inches), had brought the level of Wixom Reservoir down approximately 4.6 feet below the normal pond elevation of 675.8 NGVD to 671.2 feet NGVD.

24.     By the time the FERC-mandated inspection of the Smallwood Dam spillway tailrace had been completed, the Edenville Dam was no longer FERC-licensed. Therefore, in the absence of an established NREPA Part 307 Lake Level Court Order establishing mandatory levels for the Wixom Reservoir, there were no legal requirements for maintaining any specific water level in the Wixom Reservoir.  Therefore, in anticipation of the coming winter freezing conditions, for safety reasons, Boyce continued to allow the Wixom Reservoir level to recede until  a "Run-Of-River" (ROR) level as controlled by the natural flow of water over the top of the concrete spillway sills was achieved. This ROR level was approximately 669 NGVD which is 6.8 feet below the normal previously FERC-licensed operational pond level. Thus, with all Edenville Dam spillway gates raised out of the river flow, Boyce maintained this level from October 29, 2018 through April 8, 2019, except for instances of rain storm  precipitation -related fluctuations.

25.     In the absence of a FERC license or a NREPA Part 307 Lake Level Court Order, and based primarily on risk mitigation pertaining to dam and human safety concerns, Boyce adopted the best practice of following the September 14, 2018 and September 19, 2018 FERC orders, including their prescriptions regarding the monitoring of mussels during the drawdown. The FERC Order of September 19, 2018 stated that "the licensee (was) to immediately forward to the Michigan DNR any observations of significant strandings, or reports it receives of strandings in the Edenville reservoir, so that appropriate action can be taken.  The licensee must temporarily stop the drawdown if notified by the Michigan DNR of a stranding event that the agency believes could have significant, population level effects." At no time during the initial drawdown for the focused spillway inspection or the continuation of the drawdown after the inspection did the licensee or the dam operator receive any reports of significant strandings from any source including the Michigan DNR. Moreover, at the time of the 2018 drawdown it was and continues to be the Edenville Dam operator's (Boyce's) belief that the  September 2018 FERC orders had the legal effect of modifying the mussel survey requirement in the 5-year MDEQ NREPA Part 301 Inland Lake and Stream permit issued to Boyce on July 14, 2014.

26.     The July 14, 2014 5-year permit had authorized Boyce to drawdown Wixom Reservoir up to 8 feet below normal pool, at a daily drawdown rate not to exceed 0.5 feet (6 inches).  Boyce, furthermore, had adopted this best practice in the absence of any communication forthcoming from the MDEQ or MDNR prohibiting such action through enforcement or modification of the 2014 permit.  In sum, Boyce acted as a matter of prudent risk management and best practice in preparing for the real possibility that harsh winter weather conditions, like those it experienced in 2017, would again beset the Edenville Dam site in 2018.

27.     Moreover, Boyce reasonably believed that its cautionary and preventative action was consistent with two prior FERC orders.  On September 9, 2013, FERC had issued an order approving Boyce's plan to pre-lower the reservoirs prior to the onset of winter (i.e., prior to December 16) as an acceptable interim risk mitigation solution until dam safety improvements at the Edenville Dam site, namely, the construction of two auxiliary spillways, could be completed. This prior order had effectively modified the post-December 15 drawdown commencement date imposed by Article 404 of the Edenville Dam FERC license to allow for the pre-lowering of the Wixom Reservoir as a preventive measure in anticipation of severe storm and flood events as had been experienced in previous years.

28.     On January 5, 2018, "given the potential safety concerns at the project during extremely cold weather" experienced during November and December 2017, FERC issued an order approving Boyce's use of the Edenville Dam "powerhouse to pass flows until March 1, 2018, with the spillway gates closed, "unless further extended by the Regional Engineer based on ice conditions." Based upon photographic evidence supplied by Boyce in December 2017 the FERC had found that the accumulation of large ice formations on the concrete sidewalls of the dam's spillways when the force of the water and wind conditions caused spray to spew through the Tainter gates when opened and closed to maintain reservoir levels posed a significant and unacceptable structural hazard to the integrity of the dam's already somewhat compromised concrete civil structures. The FERC also had found that Boyce's photographs illustrating dam operating personnel standing on the  narrow 18 inch wide ice-encrusted concrete sidewall, 30-to-40 feet above the concrete spillway apron slab  secured with safety harnesses only capable of being attached to the posts of chain-link fences, posed an  obvious and unacceptable hazard to the safety of the operator personnel.

29.     FERC's prior orders, moreover, must be viewed in light of 16 U.S.C. § 803(c), which subjects each FERC dam licensee to liability for all damages caused to the property of others resulting from the operation of project works.  Indeed, it cannot be ignored or dismissed that FERC clearly understood that Boyce would be financially unable to bear such liability in the event of the Edenville Dam's failure caused by harsh winter conditions experienced in 2017. For those reasons, and as a matter of prudent risk avoidance, FERC instructed Boyce to implement interim safety precautions and measures.

30.     From September 25, 2018 (i.e. after FERC revoked the license for Edenville Dam), until the end of the winter of 2018-2019, EGLE-WRD, EGLE-WRD-DS, and MDNR assumed regulatory and enforcement jurisdiction over the operation of the Edenville Dam in its ongoing prevailing condition, "as it relate[d] to dam safety and environmental matters." However, during this period neither EGLE-WRD, EGLE-WR-DS, nor MDNR, affirmatively intervened,   requested, or directed Boyce to do anything differently than what it had done and was doing.

31.     EGLE-WRD did not allege that Boyce had violated NREPA Part 301 because it lacked a temporary drawdown permit, and it did not seek to enforce or otherwise modify the drawdown conditions the July 14, 2014 5-year NREPA Part 301 permit had imposed. EGLE-WR-DS also did not invoke any dam-safety-related NREPA Part 315 provision that would either have obviated the need for Boyce to continue its drawdown practices or otherwise required it to undertake additional action.  For example, EGLE-WR-DS did not invoke MCL 324.31516(d), which would have obviated Boyce's need to continue these drawdowns because the agency had reduced the State of Michigan's ½ PMF standard for the Edenville Dam to the 200-year flood standard, based on its determination that the dam's failure under such standard

would not trigger additional risk of flood loss. EGLE-WR-DS also did not invoke MCL 324.31516(e)(3), which would have required Boyce, because the agency had determined it could not pass the State's ½ PMF standard, to construct an auxiliary spillway.

32.     MDNR, furthermore, did not allege before, on, or after September 25, 2018, that Boyce had violated, and thus, MDNR did not seek to enforce or otherwise modify, the mussel survey conditions the July 14, 2014 5-year NREPA Part 301 drawdown permit had imposed. Moreover, MDNR did not allege that Boyce had violated, and thus, during the winter of 2018-2019, MDNR did not seek to enforce or otherwise modify the mussel survey parameters the agency had first provided and then confirmed to Boyce's wetland expert via emails dated September 18, 2018, and September 20, 2018. Boyce reasonably believed, based on MDNR's ongoing liaison with EGLE-WRD on FERC license compliance-related matters, that the MNDR's mussel survey parameters had significantly modified (narrowed) the MDEQ-issued July 14, 2014 5-year permit's mussel conditions.

33.     MDNR did not exercise its jurisdiction over the Edenville Dam drawdown of Wixom Reservoir before September 25, 2018, as the result of the preemptive FERC September 14, 2018 order expressly refusing on multiple grounds to require the unworkable mussel stranding survey and relocation plan MDNR had previously recommended.   While MDNR had been subject to that FERC order, the agency was apparently minimally satisfied that such FERC order had required Boyce to inform FERC and MDNR of any observations or reports it received of significant mussel strandings, and to temporarily stop a drawdown and identify proposed remedial measures if notified by MDNR of a significant stranding event the agency believed could have significant population-level effects.

34.    At no time, however, from September 25, 2018 onward, during the entire period of the 2018 Wixom Reservoir drawdown, did MDNR assert any NREPA violations or seek any enforcement or modification of any of the mussel survey conditions the July 14, 2014 5-year NREPA Part 301 drawdown permit had imposed.  MDNR also did not assert that Boyce had violated any of the mussel survey parameters MDNR had subsequently agreed to in September 2018 with Boyce's expert via email. More importantly, at no point during this time period did Boyce or its personnel ever observe, nor was Boyce ever informed by anyone (including MDNR) of, any mussel strandings.

35.    On November 12, 2019, Boyce commenced the winter drawdown of the Wixom Reservoir from an elevation of 675.8 NGVD to an elevation of 669.2 NGVD reached on December 25, 2019, at an average daily rate not exceeding 0.7 feet (8.4 inches).  The level reached was approximately 6.6 feet below normal pond and 3.6 feet below the previously FERC-licensed normal winter drawdown level. Boyce has continued to maintain the reservoir at this level, save for storm or precipitation event-related fluctuations, out of an abundance of concern for the safety of its operations personnel and the downstream communities.

36.    Boyce proceeded with the November 12, 2019 winter drawdown in concurrence with the Four Lakes Task Force ("FLTF"), pending the closing of their April 2019 agreement to transfer ownership of the four Boyce hydroelectric dams (including Edenville Dam), after having undertaken considerable investigation, inspection and deliberations amongst themselves, after maintaining ongoing contact with EGLE-WR-DS concerning the safety of Edenville Dam, from August 2018 through November 2019, and after having waited almost 60 days for EGLE-WRD to respond to their permit application.

37.     The FLTF is a "Delegated Authority" formally created by resolutions passed in Midland and Gladwin Counties to administer and oversee the maintenance and operations of the four dams and reservoirs.  Having secured its NREPA Part 307 authority by Court Order on May 28, 2019, the FLTF filed on June 20, 2019 (pending the closing of the dam transfer agreement with Boyce),a preliminary permit application with FERC to study the possibility of obtaining a new FERC license for the Edenville Dam. In furtherance of that application, it proceeded prudently, in August 2019, to perform an inspection of the Edenville Dam to evaluate the ongoing prevailing dam safety-related conditions at the site.

38.     The FLTF, acting as Boyce's agent, next filed a joint NREPA Part 301/307/315 permit application with the EGLE-WRD, on September 25, 2019.  This joint permit application sought EGLE authorization to pre-lower the Wixom reservoir prior to the 2019-2020 winter season under the same conditions the MDEQ had previously approved in July 2014, and which FERC had previously approved in the series of prior orders discussed above. Specifically, it sought to commence the winter draw down by November 4, 2019.

39.     Based on its review of FERC records for the Edenville Dam and the August 2019 inspection findings, the FLTF became aware of and agreed with FERC's prior concern regarding how the significant winter ice conditions that Boyce experienced at the dam in 2017 and 2018 had posed unacceptable public and dam operator safety risks demanding immediate resolution.   With the Edenville Dam gates not operating well and with no auxiliary spillways yet under construction, the FLTF agreed with Boyce's decision to cautiously adopt the prior interim dam safety measure that FERC had previously approved in its prior orders as discussed above.  Such interim measure entailed Boyce's *pre*-lowering of the Wixom Reservoir before

the anticipated harsh winter season pending the future completion of auxiliary spillways and other necessary Edenville Dam repairs and maintenance the FLTF plans to undertake.

40.     To support this prudent and cautious interim dam safety measure, the FLTF's dam safety engineers had previously issued, on September 18, 2019, an explanatory memorandum to Lucas Trumble, P.E., one of only three personnel responsible for administering and enforcing the dam safety laws and regulations of the State of Michigan.  The memorandum summarized the gate tests that Boyce's dam safety engineer had previously performed in the presence of the FLTF's dam engineers at the Edenville Dam on June 14, 2019.   The memorandum emphasized that "[t]he original Edenville Hydroelectric project was designed with six radial gates to allow for normal operation and to release floodwaters when lake elevations begin to rise after a rainfall event. The […] (FERC) requires that all high hazard dams be capable of safely passing 100% of the Probable Maximum Flood (PMF).  EGLE requires safely passing the ½ PMF.  Since the dam was designed and constructed prior to the time of FERC and EGLE regulation, the original design did not consider present day design capacity requirements."  The memorandum concluded that "[t]he current engineering opinion, based on observation of the gate tests, is the gates at Edenville should only be operated with the original hoist mechanisms until they can be placed with electric hoists.  Using the portable A-frames and the manual lever hoist is cumbersome and requires too much to operate under emergency conditions. Most importantly, though, the A-frames require that a minimum of three operators be at each site.  Those operators would be exposed to unsafe conditions, which is unacceptable. At this point in time, based on the documents reviewed, the FLTF does not believe that the Edenville Dam can be operated to meet the EGLE dam safety requirement to pass the ½ PMF without certain repairs and improvements."

41.    While under FERC licensure, the Edenville Dam had long been considered potentially unsafe to downstream communities because its inadequate spillway capacity had rendered it barely able to satisfy one-half of the FERC 100% PMF standard.  Now, following Boyce's loss of the Edenville Dam license, the dam safety engineers of the dam's prospective acquiror (FLTF) have since determined that the 95-year-old high hazard embankment dam would fail to meet even the State of Michigan's 50% PMF standard, in light of not only its historically inadequate spillway capacity, but also its old age and the poor condition of its critically important Tainter Gates and hoisting equipment. Notwithstanding these recent findings, however, EGLE-WR-DS had failed to render a determination regarding whether the Edenville Dam is potentially unsafe to downstream communities, especially if it were to be operated during harsh winter weather conditions in the absence of a winter Wixom Reservoir drawdown to ROR levels.

42.    On October 2, 2019, having been notified of the joint NREPA Part 301/307/315 permit application Boyce and FLTF had filed on September 25, 2019 with EGLE-WRD, MDNR dispatched a letter to Defendant Rudolph of EGLE-WRD, but not to Boyce or FLTF, likely authored by or with the constructive input of Defendant Kruger of MDNR.[1]  The letter stated that MDNR "generally opposes drawdowns that are not for the express purpose of dam maintenance or repairs directly related to health and safety issues.  In this case, [MDNR] is not convinced that the alternatives analysis – particularly, Option 3 (Using the Tainter Gates and Concrete Spillways) was fully vetted, as there may be deicing options that could be implemented relatively quickly that could reduce the drawdown extent."  The MDNR letter also stated that "[t]he timing of this proposed drawdown is also well outside the recommended

---

[1] Defendant Kyle Kruger is the first name on the letter's list of seven copied recipients.

season for mussel relocation […] and has the potential to exacerbate natural resource damages previously inflicted by the unpermitted Winter 2018 drawdown."

43.     The MDNR's October 2, 2019 letter, in addition, stated that, "[i]f Part 315 Dam Safety Program determines that the full 8-foot drawdown is the only viable option to preserve the integrity of the dam structures, there are several conditions that must be met for the [MDNR] to be supportive." MDNR called for the 8-foot drawdown to be subject to the following conditions if it was "deemed necessary": (1) it should "start no later than the first week of November"; (2) it "should not exceed 0.5 ft per day"; (3) the applicant should develop a Stranded Organism Survey and Relocation Plan ("Plan") for MDNR's approval, after having consulted "the Michigan Freshwater Mussel Survey and Relocation Protocols," which provides for: (a) daily stranded fish and mussel surveys are conducted by inspecting the shallow water margins and backwaters of the reservoir areas as the water level recedes, and walking the exposed bottomlands to identify burying mussels; (b) stranded mussel relocation as soon as possible (within the day) until the drawdown is complete; (c) a survey area map; and (d) a commitment to secure all necessary permits and to provide public notice; (4) notification to MDNR "should deviations from the approved drawdown plan *have the potential to* adversely affect natural resources" (emphasis added); and (5) documentation of all stranded organism survey and relocation efforts to be submitted in report form to MDNR.  This MDNR letter, in other words, had called for imposing far more conditions on the winter drawdown of Wixom Reservoir than had the July 14, 2014 5-year permit previously issued to Boyce alone.  Boyce and FLTF did not become aware of this October 2nd letter until they received EGLE-WRD's response to their previously filed Freedom of Information Act request in March 2020.

44.     Unfortunately for Boyce, not only had the severely short-staffed EGLE-WR-DS failed to provide Boyce or FLTF with a determination regarding whether the Edenville Dam met the State's 50% PMF standard in light of the dam's current compromised operating condition and capacity and the recent dam safety inspection findings, but that agency also had failed to provide MDNR with a determination that a winter drawdown of Wixom Reservoir using the Edenville Dam's Tainter Gates and concrete spillways, as the prior July 14, 2014 5-year permit had previously authorized, was deemed necessary under the same dam safety-related circumstances as had previously prevailed.

45.     On November 20, 2019, Keto Gyekis, the Coordinator of EGLE-WRD's Wetland Identification Program, submitted comments to MDNR concerning the joint Boyce-FLTF Wixom Reservoir winter drawdown permit.  Those comments stated that, "[r]esearch has shown that […] large scale cold-season drawdowns within impoundments are often associated with negative ecological effects. Various biological, chemical, and physical changes within the littoral zone during a large-scale cold-season drawdown can indirectly affect ecological condition within the rest of the impoundment. […] A drawdown after the cold-season commences can expose […] hibernating animals to very cold dry air, where they can desiccate irreversibly." (emphasis added).  These comments, furthermore, stated that, "Rainbow mussel (Villosa iris), is a State-listed Special Concern species that is suspected to inhabit the upper end of the Tobacco River portion of the Wixom Lake where there is normally some lotic current. State/Federal mussel maps indicate that this species also likely inhabits more than a mile segment of the Tobacco River adjacent to the north end of the reservoir. Pertaining to this mussel species, Michigan Natural Features Inventory literature recommends that unnatural hydrological alterations be avoided. A significant winter drawdown could strand and kill

individuals of this species and other native mussel species, primarily because they can not relocate (or be relocated) effectively. We do not support implementation of a winter drawdown." (emphasis added). Boyce and FLTF did not become aware of this letter until they received EGLE-WRD's response to their previously filed Freedom of Information Act request in March 2020.

46. On November 25, 2019, EGLE-WRD issued its denial of the joint NREPA Part 301/307/315 permit application for a winter drawdown of Wixom Reservoir that Boyce and FLTF had previously filed. The hypothetical research grounds (rather than actual experience) upon which the agency's denial of the permit application had been based, as set forth in the letter, was identical to the November 20, 2019 EGLE-WRD comments submitted by the agency's Wetland Identification Program Coordinator, Keto Gyekis. In addition, the denial letter rejected the use of the Edenville Dam's Tainter Gates and Concrete Spillways and recommended "feasible and prudent alternatives," such as regularly scheduled daily use of "de-icing measures" such as "heated pressure washers."

47. The EGLE-WRD denial letter, in addition, contravened a newly added applicable NREPA provision by failing to disclose any of the scientific research it indirectly referenced as alleged support for the agency's allegations that "large-scale cold-season drawdowns within impoundments *are often associated with* negative ecological effects." (emphasis added). The EGLE-WRD denial letter, furthermore, failed to speak in terms of "causation" or "correlation;" instead, it spoke in terms of "possibility" – i.e., "can become", "can decrease," and "can be negatively affected indirectly." Moreover, it failed, as did the July 14, 2014 5-year NREPA Part 301 permit, to provide any scientific standard or sample protocols for conducting mussel surveys. The EGLE-WRD denial letter also contravened a second newly

amended applicable NREPA provision by failing to provide scientific support for the allegedly "feasible and prudent" alternatives the agency required to "lessen or eliminate the negative effects" a below-normal winter drawdown would allegedly trigger. These scientifically unsubstantiated alternatives unreasonably required Boyce to employ the very same de-icing measures in lieu of such drawdown which the FERC had previously concluded posed unacceptable dam structural safety, dam operator safety and downstream public safety risks that demanded immediate attention.

48.     On November 27, 2019, FLTF's counsel dispatched a letter to EGLE-WRD, on Boyce's behalf, stating that, since EGLE-WRD had long known and well understood that the Wixom Reservoir mussel recovery plan submitted as part of the joint permit application required the reservoir drawdown to begin no later than the first week of November, the agencies had insisted on public notice and hearing that would have had the effect of rendering a proper and orderly winter drawdown, as had occurred in 2018, all but impossible to achieve if Boyce had not commenced it on November 12, 2019.  In other words, EGLE-WRD's imposition of a public notice and hearing requirement before rendering a decision on whether to issue the drawdown permit had been "purposefully scheduled to prevent" the undertaking of "a more effective mussel recovery plan." The letter also concluded that "EGLE[-WRD] representatives purposely created a bureaucratic situation where the outcome was all but certain, namely, to deny the drawdown permit."

49.     On December 2, 2019, FLTF's counsel filed a Petition for Contested Case Hearing (#HNS-X17S-6B1RG), on behalf of Boyce, protesting the EGLE-WRD joint permit denial.[2]

---

[2]  Boyce's counsel filed a supplement to the previously filed FLTF Petition for Contested Case Hearing on December 17, 2019.

50.    On December 12, 2019, EGLE-WRD issued an Enforcement Notice against Mueller and Boyce alleging that the November 2019 drawdown of Wixom Reservoir to a level below the normal winter drawdown level "allowed by the Part 307 Lake Level Order, and prior to the allowable winter drawdown timeframe of December 15, violated NREPA Parts 301, 307 and 303 and resulted in surface water drainage of adjacent wetlands and other damage to natural resources, including freshwater mussels."  This Enforcement Notice also indicated that Boyce could come into compliance with NREPA by "immediately ceasing [the] active drawdown of Wixom Lake" and abiding by the Part 307 Lake Level Order, and warned that if it did not do so, EGLE-WRD "may take escalated enforcement against Boyce Hydro and others who are collaborating with Boyce on the drawdown."

51.    Significantly, the December 12, 2019 EGLE-WRD Enforcement Notice revealed that the agency had misconstrued paragraphs 6 and 7 of the NREPA Part 307 Lake Level Order. When read together, these paragraphs had effectively incorporated by reference all the provisions of the most recent Edenville Dam FERC license, including as amended or temporarily modified by a subsequently issued FERC Regional Engineer determination letter/order and several subsequently issued FERC headquarters orders concerning interim dam safety measures, variances to required Wixom Reservoir elevation levels, and abatement of the need to conduct mussel stranding surveys prior to and/or during winter drawdowns, as had previously been the customary FERC practice when Boyce had held the license.

52.    On January 21, 2020, counsel from the Office of the Michigan Attorney General ("MIAG") emailed  counsel for Boyce a correspondence clearly indicating that the State of Michigan will file a civil action against the Plaintiffs seeking natural resource damages, and an order to restore and repair the "millions of freshwater mussels," including snuffbox mussels

listed as a federally endangered species, that were allegedly "killed" as the result of the Edenville Dam drawdowns of the Wixom Reservoir that occurred during the fall and winter of 2018 and 2019. The MIAG counsel also stated that he would send "a courtesy copy of the complaint once it is filed, which will happen relatively soon."  Neither counsel for MIAG nor the Defendant agencies then provided for Plaintiffs' evaluation any scientific evidence establishing that these reservoir drawdowns, aside from other relevant and material variables, had, in fact, caused the mussel kills the State had alleged.

53.     On February 2, 2020, counsel for MIAG emailed counsel for Boyce 2018 Mussel Survey Field Data Sheets and an accompanying Excel spreadsheet compiling said data that MDEQ and MDNR personnel had prepared during the mussel surveys they conducted in Wixom Reservoir and along the shores of the Tittabawassee and Tobacco Rivers upstream of the Edenville Dam on November 2, 2018, November 9, 2018 and November 14, 2018 during the 2018 Wixom Reservoir drawdown.   In addition, counsel for MIAG subsequently sent counsel 2019 Mussel Survey Field Data Sheets and an accompanying Excel spreadsheet compiling said data that MDEQ and MDNR personnel had prepared during the mussel surveys they conducted in Wixom Reservoir and along the shores of the Tittabawassee and Tobacco Rivers upstream of the Edenville Dam on December 13, 2019, December 20, 2019, and December 23, 2019 during the 2019 Wixom Reservoir drawdown.  The February 2, 2020 email also was accompanied by "[s]ome side notes" and "[a] contour map calculating the amount of the bottomland exposed by an eight foot drawdown […which] contour lines were identified using the maps contained by Navionics" searchable via Google.  Lastly, the February 2, 2020 email referenced and provided the weblink to the "American Fisheries Society, Special Publication 35" – "Investigation and Monetary Values of Fish and Freshwater Mollusk Kills,"

for Plaintiffs' experts to use in calculating "the size of the damage claim."  Neither MIAG counsel nor Defendant agencies referenced in that email "American Fisheries Society, Special Publication 8" – "A Guide to Sampling Freshwater Mussel Populations."

54.     Indeed, neither counsel for MIAG nor the Defendant agencies then provided for Plaintiffs' evaluation the scientific protocols and procedures the State agencies and their officials used in conducting such mussel surveys, including those protocols and procedures the Defendant agencies had employed relating to: (i) the sampling of the mussels surveyed; (ii) the submission of sampled mussels for laboratory evaluation and the determination of cause of death; (iii) the validation of the species and subspecies of each of the mussels sampled; (iv) the validation of the method(s) employed to extrapolate from those species and subspecies of mussels surveyed for purposes of calculating the overall mussel kill that occurred in Wixom Reservoir and along the shores of the Tittabawassee and Tobacco Rivers upstream of Edenville Dam as the result of the 2018 and 2019 Wixom Reservoir drawdowns, individually and collectively.

55.     On February 10, 2020, counsel from MIAG emailed Plaintiffs' counsels 6 aerial photographs Defendant MDNR had taken with a drone the agency used "to perform a survey after the 2018 drawdown."  Neither MIAG counsel nor the Defendant agencies provided for Plaintiffs' review any references to the dates on which and the precise locations at which each of these photographs had been taken.

56.     On February 24, 2020, counsel from MIAG emailed Plaintiffs' counsels a note stating that "a conservative estimate of the value of the mussels killed by the two combined drawdowns is over $300 million," and that even if "DNR was mostly wrong – say even 90% wrong – […] we're still talking about a very large sum of money."  The February 24, 2020

email also stated that "it is very unlikely that the State would agree to a resolution in which the assessment payers bear the financial burden of resolving the mussel kills caused by the drawdowns," *effectively implying that the full costs of resolving the mussel kills should be borne by Plaintiffs alone*.   Neither counsel for MIAG nor Defendant agencies then provided for Plaintiffs' evaluation any scientific evidence establishing that the 2018 and 2019 Edenville Dam Wixom Reservoir drawdowns, aside from other relevant and material variables, had, in fact, caused the massive mussel kill the State had alleged.

57.     On February 25, 2020, counsel from MIAG emailed Plaintiffs' counsels several spreadsheets prepared by Defendants EGLE and MDNR estimating State natural resources damages ranging in value from approximately $261 million to approximately $412 million. Neither counsel, nor the Defendant agencies then provided for Plaintiffs' evaluation, other than in a general conceptual formulation, a scientific validation of the specific bases for the State's determination of the economic value of each unit of species and subspecies of mussels surveyed that the State had alleged had been killed as the result of the 2018 and 2019 Edenville Dam Wixom Reservoir drawdowns.

58.     On March 13, 2020, counsel from MIAG send Plaintiffs' counsel an email stating that the State would resolve the matter with Plaintiffs if the Plaintiffs were willing to remit no less than $200,000 in statutory fines.  *In addition*, MIAG counsel indicated that the State also might consider resolving its imminent natural resources damages claim, which, "based on its calculations," "is in the hundreds of millions" of dollars, if Plaintiffs were to offer $5.5 million to resolve the claim.  "While the State is certainly willing to sue in pursuit of the public interest, it recognizes that the public interest can also be served by expeditiously reaching

a settlement. The State reiterates that is not open to any of that $5.5 million being paid by the assessment payers."

59.     On April 20, 2020, Plaintiffs' counsel emailed to counsels for the MIAG Plaintiffs' considered and detailed response to MIAG's threat of an imminent natural resources damages action.

60.     On April 21, 2020, counsel for MIAG sent Plaintiffs' counsel an email stating the State would not accept Plaintiffs' response to resolve the State's impending claims in exchange for payment of $200,000.  Counsel for MIAG stated that, "[i]n short, the State believes it can likely obtain a judgment against Boyce, and for substantially more than $200,000."

61.     On April 22, 2020, counsel for MIAG sent Plaintiffs' counsel another email stating that Plaintiffs should "keep in mind that this is essentially a business decision for the State – why settle for $200,000 if it can collect substantially more than that by getting a judgment, even taking the costs of litigation into account.  Boyce really needs to get into seven figures if it wants to get the State's attention."

## COUNT I – VIOLATION OF PRIVILEGES AND IMMUNITIES CLAUSE OF THE UNITED STATES CONSTITUTION

62.     Plaintiffs hereby incorporate by reference the allegations set forth above as if fully set forth herein.

63.     Article IV, § 2, clause 1 of the U.S. Constitution provides that "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the Several States."

64.     Plaintiff Mueller, an individual natural person, and a citizen and resident of the State of Nevada doing business in the State of Michigan, is eligible to seek protection under the Privileges and Immunities Clause of Article IV of the U.S. Constitution and under § 1 of the Fourteenth Amendment to the U.S. Constitution.

65.     The Privileges and Immunities Clause applies to state laws and regulations that explicitly identify out-of-state citizenship as a basis for disparate treatment, and to state laws and regulations that are facially neutral – i.e., they do not on their face create classifications based on any individual's residency or citizenship, but have the practical effect of discriminating resulting in disparate treatment of out-of-state citizens.

66.     The facially neutral administration and enforcement actions taken against Plaintiff Mueller by Defendants EGLE-WRD and MDNR, and directly and/or indirectly by Defendants Rudolph, Pingel and Kruger, employing facially neutral NREPA statutory and regulatory provisions, of State common law tort and public trust law doctrines, and of the agencies' unstated dam-removal policies, rooted, in part, in European environmental and natural resource law, to-date, has unduly frustrated, if not, curtailed, to-date, Plaintiff Mueller's economic activities in the State of Michigan.  These economic activities include his operation of Edenville Dam and three other FERC-licensed dams located immediately upstream and downstream from Edenville Dam.

67.     The facially neutral administration and enforcement actions taken against Plaintiff Mueller by Defendants EGLE-WRD and MDNR, and directly and/or indirectly by Defendants Rudolph, Pingel and Kruger, employing such facially neutral laws, regulations and policies, to-date, *plus* the State of Michigan's imminent multimillion dollar lawsuit unduly burden, curtail and severely threaten Plaintiff Mueller's ability to conduct his non-dam-related real estate development investment activities in the State of Michigan.

68.     The facially neutral administration and enforcement actions taken against Plaintiff Mueller by Defendants EGLE-WRD and MDNR, and directly and/or indirectly by Defendants Rudolph, Pingel and Kruger, employing such facially neutral laws, regulations and

policies, to-date, furthermore, have severely burdened and delayed the highly complex transaction Plaintiff Mueller and FLTF have endeavored to structure during the past two years that will facilitate the transfer and sale of all four hydroelectric dams from Plaintiff Boyce to FLTF in 2022.

69.     The facially neutral administrative actions of Defendants EGLE-WRD and MDNR, and directly and/or indirectly by Defendants Rudolph, Pingel and Kruger, which have led to the State of Michigan's imminent multimillion dollar lawsuit which counsel to MIAG has estimated to be in the *hundreds of millions of dollars*, plus *several hundred thousand dollars* in statutory fines and penalties, effectively singles out Plaintiff Mueller in a disguised effort to confiscate, siphon off and appropriate, all, if not, most of any profits Plaintiff Mueller will make from his 15-year investment in the four hydroelectric dams that will be sold.

70.     In sum, the State of Michigan's imminent multimillion dollar lawsuit will severely economically discriminate against Plaintiff Mueller as a non-state Nevada resident and citizen, and substantially deny him his constitutional right to pursue economic interests in, and to conduct trade or making a living upon crossing into the State of Michigan, in violation of the Privileges and Immunities Clause.

## COUNT II – VIOLATION OF FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAUSE

71.     Plaintiffs hereby incorporate by reference the allegations set forth above as if fully set forth herein.

72.     The due process clause of the Fourteenth Amendment has both procedural and substantive components.

73.     Substantive due process is the doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures

employed. The Substantive due process doctrine protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.' It also protects the right to be free from 'arbitrary and capricious' governmental actions, which is another formulation of the right to be free from conscience-shocking actions. The Fourteenth Amendment's substantive due process clause also extends to other rights and liberties recognized by the courts to be 'fundamental.'

74.    The facially neutral administration and enforcement actions taken against Plaintiffs by Defendants EGLE-WRD and MDNR, and directly and/or indirectly by Defendants Rudolph, Pingel and Kruger, employing facially neutral NREPA, common law and public trust doctrine-based laws, regulations and policies in an arbitrary and capricious manner, to-date, have violated Plaintiffs' right not to be subject to arbitrary and capricious government action that is so egregious and outrageous that it shocks the conscience and violates the decencies of civilized conduct. In addition, said right is also a liberty interest implicit in the concept of ordered liberty that is deeply rooted in this Nations' history and tradition and essential to the orderly pursuit of happiness by free men, 'such that neither liberty nor justice would exist if they were sacrificed.'

75.    Such "shock-the-conscience" and "no rational basis" conduct of the Defendants includes the following: (1) the agencies' and officials' intentional failure to abide by NREPA law requiring scientific substantiation of the agencies' predisposed denial of Plaintiffs' Part 301, 303 permit jointly filed with FLTF, thereby compelling Plaintiffs' incursion of not insignificant expenditures to protest the agency decision in an administrative hearing; (2) the Defendants' intentional failure to take any actions to prevent or mitigate damages to the natural resources

(i.e., freshwater mussels) alleged to have been killed as the result of the Plaintiffs' Edenville Dam Wixom Reservoir 2018 and 2019 winter drawdowns, such as issuing an administrative stop order demanding cessation of either of the drawdowns, or failing to modify Boyce's July 14, 2014 NREPA Part 301 5-year-permit between 9-25-18 and the permit's expiration on 7-24-19 to prevent a mussel kill; (3) the Defendants' intentional failure to provide any substantiating scientific evidence demonstrating the proximate cause of the alleged mussel kill, and failure to provide probative evidence that other well-known factors and variables are not likely responsible for the mussel kill, such as invasive species, pollution, sedimentation, recreational activities, predation, disease, etc.; (4) the Defendants' intentional failure to adequately regulate invasive species of mussels and fish known to adversely impact the millions of freshwater mussels the Defendants' have alleged that Plaintiffs' Edenville Dam winter drawdowns have caused; (5) the Defendants' intentional failure to adequately regulate the safety of the more than 1,000 Michigan dams, many of which are substantially beyond their 50-year useful life, and approximately 100 of which are high hazard dams, including the Edenville Dam, a 95-year-old embankment dam with allegedly inadequate spillway capacity, despite the comprehensive Edenville Dam FERC record and the recent FLTF Edenville Dam inspection revealing ongoing potentially unsafe circumstances and conditions that threaten downstream communities; (6) the Defendants' intentional failure to disclose the scientific methodologies, protocols, procedures or standards the State employs to ensure mussel preservation and protection and to limit dam reservoir drawdowns to certain elevations that dam owners and operators such as Plaintiffs could identify and follow; (7) the Defendants' intentional failure to disclose any State scientific methodologies, protocols, procedures or standards employed to undertake mussel kill sampling and autopsy evaluation, and economic damages assessment; (8) the Defendants' intentional

failure to disclose any scientific methodologies, protocols, procedures or standards employed for the purpose of identifying and locating the precise critical habitats of State-listed freshwater mussel species and of federally listed endangered or threatened mussels species, such as the snuffbox mussel, as required by the Endangered Species Act, but yet alleging that millions of freshwater mussels of assorted species, including the endangered snuffbox mussel, were allegedly killed as the result of Plaintiffs' 2018 and 2019 winter drawdowns of Wixom Reservoir; and (9) the Defendants' recent announcement of the imminent filing by MIAG of a multimillion dollar lawsuit against Plaintiffs seeking hundreds of millions of dollars of damages, which lawsuit is actually a disguised effort to attach, confiscate, appropriate or otherwise siphon off from the executed Boyce-FLTF transaction that will be completed in 2022, any profit Plaintiffs may yet realize from their 15-year investment in the four hydroelectric dams transferred/sold.

76.     In addition to such government "shock-the-conscience" and "no rational basis" conduct, the facially neutral administration and enforcement actions taken against Plaintiffs by Defendants EGLE-WRD and MDNR, and directly and/or indirectly by Defendants Rudolph, Pingel and Kruger, employing facially neutral NREPA, common law and public trust doctrine-based laws, regulations and policies, also have severely violated Plaintiff's ability to exercise their constitutionally protected rights.  These rights, which are implicit in the concept of ordered liberty and are deeply rooted in this Nations' history and tradition, include Plaintiffs' right to execute contracts and to use their private real property fee simple interests in Edenville Dam and adjacent terrestrial lands, fee simple and licensed interests in the bottom lands of Wixom Reservoir, the Tittabawassee River and the Tobacco River, and other private real property fee

simple interests in the terrestrial lands adjacent to the upstream FERC-licensed Smallwood Dam.

### COUNT III – VIOLATION OF EIGHTH AMENDMENT EXCESSIVE FINES CLAUSE INCORPORATED IN THE FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAUSE

77.     Plaintiffs hereby incorporate by reference the allegations set forth above as if fully set forth herein.

78.     The purpose of the Eighth Amendment was to limit the government's power to punish. The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, 'as *punishment* for some offense.' Like the Eighth Amendment's proscriptions of 'cruel and unusual punishment' and 'excessive bail,' the protection against excessive fines guards against abuses of government's punitive or criminal-law-enforcement authority. This safeguard has been held 'fundamental to our scheme of ordered liberty,' with 'deep roots in our history and tradition.'  As such, the Excessive Fines Clause is incorporated by the Due Process Clause of the Fourteenth Amendment.

79.     MIAG counsel's email to Plaintiffs' counsel that the State of Michigan will file imminently a lawsuit against Plaintiffs alleging hundreds of millions of dollars of natural resources damages as the result of Plaintiffs' winter drawdowns of Wixom Reservoir in 2018 and 2019, which damages the State insists must be assessed entirely against Plaintiffs individually and collectively, without contribution by State of Michigan residents living along the shores of Wixom Reservoir or the Tittabawassee and Tobacco Rivers upstream therefrom, is excessive and punitive within the meaning of the Eighth and Fourteenth Amendments to the United States Constitution.

80.     First, Defendants EGLE-WRD and MDNR and their officials, Defendants Rudolph, Pingel and Kruger, have intentionally and maliciously failed to tender scientifically substantiated or otherwise validated proof establishing that Plaintiffs' winter drawdowns of Wixom Reservoir in 2018 and 2019 was the proximate cause of the millions of mussel deaths these Defendants have alleged.   In addition, these Defendants have intentionally and maliciously failed to provide any probative evidence ruling out whether other well-known and documented factors and variables partly, if not, entirely were likely responsible for the mussel kill, such as invasive species, pollution, sedimentation, recreational activities, predation, disease, etc. Defendants, furthermore, fail to recognize FERC's preemption over State of Michigan environmental and wildlife laws, and tort laws, during 2018, while the Edenville Dam FERC license remained in effect.

81.     Arguably, Defendants also failed to properly recognize that paragraphs 6 and 7 of the NREPA Part 307 Lake Level Order establishing the levels *inter alia* at Wixom Reservoir for FLTF to enforce as the Delegated Part 307 Authority of Gladwin and Midland Counties, Michigan, which applied to Boyce's Edenville Dam 2019 winter drawdown, incorporates all of the terms of the Edenville Dam FERC license as amended and modified by subsequently issued FERC Chicago Regional Engineer and FERC Headquarters Orders, especially those concerning interim dam safety measures, variances to required Wixom Reservoir elevation levels, and abatement of the need to conduct mussel stranding surveys prior to and/or during winter drawdowns, as had previously been the customary FERC practice when Boyce had held the license.

82.     Consequently, based on the above, these Defendants have failed to determine the degree of reprehensibility of Plaintiffs' conduct.

83.     Second, Defendants EGLE-WRD and MDNR and Defendants Rudolph, Pingel and Kruger, have intentionally and maliciously failed to present any validated source of scientific or technical evidence demonstrating they have accurately calculated the actual harm, in ecological terms of actual mussels killed and in actual dollar economic terms, as the proximate result of Plaintiffs' Wixom Reservoir winter drawdowns in 2018 and 2019.   All that these Defendants have provided are the bases for their damages claims grounded on nongovernmental American Fisheries Society standards unproven in science or in a court of law that are based on hypothetical academic theories and unverified mathematical extrapolations therefrom.

84.     Consequently, it is difficult, if not impossible for Plaintiffs, if not any other reasonable person, to establish any scientifically grounded method for comparing the actual harm the State will claim it has suffered with the hundreds of millions of dollars of damages the State will imminently seek in its forthcoming fantastical lawsuit against Plaintiffs.

85.     MIAG's counsel has relayed to Plaintiffs' counsel that EGLE-WRD and MDNR were willing to accept from Plaintiffs a payment of $200,000 to resolve the agencies' forthcoming claim of NREPA Part 301/303/307 noncompliance. Nevertheless, MIAG's counsel also has relayed to Plaintiffs' counsel that EGLE-WRD and MDNR would not accept less than $5.5 million to resolve the State's forthcoming claim for natural resources damages. If this is true, then why will the State of Michigan imminently file suit against Plaintiffs for hundreds of millions of dollars for natural resources damages it will allege were caused by Plaintiffs' 2018 and 2019 Wixom Reservoir winter drawdowns? Clearly, the State of Michigan, Defendants EGLE-WRD and MDNR, and Defendants Rudolph, Pingel and Kruger, who have become emotionally charged and obsessed with enforcing NREPA compliance, specifically against

Plaintiffs, seek, through this forthcoming lawsuit, to maliciously punish Plaintiffs for defying their personal and professional mandates not to take any action without an EGLE-WRD and MDNR permit, which they capriciously deny.

86.     Consequently, Defendants have failed to determine any rational or proportionate relationship between the hundreds of millions of dollars it will seek in alleged natural resources damages, and the several hundred thousand dollars of NREPA statutory fines they will imminently seek for alleged noncompliance, which MIAG's counsel had previously agreed to accept from Plaintiffs on his clients' behalf.

87.     In sum, the fantastical penalty the State of Michigan will imminently seek to impose on Plaintiffs constitutes a constitutionally impermissible excessive fine within the meaning of the Fourteenth Amendment's Due Process Clause and Eighth Amendments Excessive Fines Clause.

**COUNT IV – VIOLATION OF FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS CLAUSE**

88.     Plaintiffs hereby incorporate by reference the allegations set forth above as if fully set forth herein.

89.     The Due Process Clause of the Fourteenth Amendment prohibits a State from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

90.     The denial, on November 25, 2019, by Defendant agencies EGLE-WRD and MDNR and their agency high officials, Defendants Rudolph and Kruger, of the joint NREPA Part 301/307/315 permit application for a winter drawdown of Wixom Reservoir that Boyce and FLTF had previously filed, directly contravened NREPA. Yet, these same Defendants have long hypocritically proclaimed that the purpose of NREPA is to ensure the regulated public's

compliance with the State's environmental and natural resources laws.   Specifically, Defendants' permit denial violated MCL 324.1307(6)(a)-(c), as amended, which became effective and enforceable against EGLE-WRD and MDNR on March 29, 2019.

91.   These newly effective NREPA statutory provisions *in toto* effectively impose on Defendant agencies, for the benefit of NREPA Part 301 and Part 303 permit applicants, an objective and accountable procedure by which these State agencies must establish and validate the scientific and other technical bases underlying a Part 301/303 permit denial. The agency must show that the denial is "based upon sufficient facts or data" contained in the administrative file, "is the product of reliable scientific principles and methods," and is the product of the reliable application of those scientific principles and methods to the facts.   In addition, the agencies must ensure that any change(s) or alternative(s) to the permit application they suggest or recommend in order to approve the permit, is "based upon sufficient facts or data" contained in the administrative file, "is the product of reliable scientific principles and methods," and is the product of the reliable application of those scientific principles and methods to the facts. Furthermore, the agencies must show that its permit denial is based on specifically cited NREPA provisions or the specific rules promulgated thereunder.

92.   The November 25, 2019 permit denial letter the Defendant agencies and officials issued failed to disclose any of the scientific research it indirectly referenced as alleged support for the agency's allegations that "large-scale cold-season drawdowns within impoundments *are often associated with* negative ecological effects." (emphasis added). The EGLE-WRD denial letter, also failed to speak in terms of "causation" or "correlation;" instead, it spoke in terms of "possibility" – i.e., "can become", "can decrease," and "can be negatively affected indirectly." In other words, the Defendant agencies' and officials' denial letter set forth only hypothetical

research, rather than empirical grounds (actual experience) as the quasi-scientific or policy-based postmodern science rationale for their denial of the joint permit. Adding insult to injury, said denial letter, like the July 14, 2014 5-year NREPA Part 301 permit Boyce had previously secured, failed to provide any scientific standard or sample protocols or methodologies for conducting mussel surveys.

93.    The November 25, 2019 permit denial letter also failed to provide scientific support for the allegedly "feasible and prudent" alternatives the agency required to lessen or eliminate the so-called negative effects a below-normal winter drawdown would allegedly trigger. These scientifically and technically unsubstantiated alternatives unreasonably required Boyce to employ the very same de-icing measures in lieu of such drawdown which FERC had previously concluded posed unacceptable dam structural safety, dam operator safety and downstream public safety risks that demanded immediate attention.

94.    Moreover, the November 25, 2019 permit denial letter failed to ensure that the denial was based on specifically cited NREPA provisions or the specific rules promulgated thereunder. Said letter stated only that, "your application for a permit submitted under the authority of Part 301, Inland Lakes and Streams; Part 303 Wetlands Protection and Part 315, Dam Safety, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (NREPA); and Part 13, Permits, of the NREPA, is hereby denied."  Clearly, referencing only a specific statutory "part" of NREPA, rather than a specific statutory "provision" or "regulation" of NREPA does not comply with and is in direct violation of MCL 324.1307(6)(a)-(c).

95.    Defendants' intentional failure to comply with MCL 324.1307(6)(a)-(c), has had definite negative ramifications for Plaintiffs' ability to defend itself against the State's

allegations of NREPA noncompliance for which Plaintiffs face exposure to fines in the hundreds of thousands of dollars.    However, Defendants' NREPA noncompliance more severely impairs Plaintiffs' ability to adequately defend themselves (and their vested fee simple and licensed real property rights otherwise exercisable in Michigan), against the State's imminent filing of a massive multimillion lawsuit that will allege hundreds of millions of dollars of damages to the State's natural resources inventory of freshwater mussels in the absence of independently verifiable scientific proof supporting those allegations. Plaintiffs will be compelled to bear considerable burdens and to expend considerable time and monies to retain scientific experts to conduct their own mussel studies in addition to those performed by FLTF's experts, as well as, legal counsel, in order to secure the opportunity for the fair hearing due process requires. Although the NREPA provides for an administrative protest procedure in the event a permit applicant seeks to challenge an EGLE-WRD and/or MDNR permit denial, it is highly uncertain whether Plaintiffs will receive the due process they deserve. Defendants EGLE-WRD and MDNR and their officials, Defendants Rudolph, Pingel and Kruger, will, no doubt, have a home court advantage, rendering such a procedure just as, if not more, costly than proceeding directly to state court where all such Defendants, in any event, also have a notable home court advantage.

96.    Consequently, the denial, on November 25, 2019, by Defendant agencies EGLE-WRD and MDNR and their agency high officials, Defendants Rudolph and Kruger, of the joint NREPA Part 301/307/315 permit application for a winter drawdown of Wixom Reservoir that Boyce and FLTF had previously filed, effectively deprives Plaintiffs of their constitutional right to procedural due process of law under the Fourteenth Amendment to the United States Constitution.

## COUNT V – VIOLATION OF FOURTEENTH AMENDMENT
## EQUAL PROTECTION CLAUSE

97.     Plaintiffs hereby incorporate by reference the allegations set forth above as if fully set forth herein.

98.     Section 1, Clause 4 of the Fourteenth Amendment states that "nor [shall any state] deny to any person within its jurisdiction the equal protection of the laws."

99.     Defendant agencies EGLE-WRD and MDNR and Defendant officials Rudolph, Pingel and Kruger have denied Plaintiffs equal protection under the law for unknown reasons wholly unrelated to any legitimate state objective. Defendants' denial, without scientific substantiation, of the joint Part 301/303/307 NREPA permit that Boyce and FLTF jointly filed was intentionally used by the State to tee up a multimillion dollar lawsuit against Plaintiffs that the State of Michigan will imminently file on putatively legal (statutory and common law public trust) grounds, but  that is primarily politically motivated.  Its threatened suit is intended to single out, discriminate, and make a public spectacle of Plaintiffs, while the State pretends to protect the public trust corpus (i.e., native freshwater mussels), which it actually has fallen far short of protecting.

100.    The State's imminent lawsuit is a false flag operation intended to shine a spotlight on Plaintiffs' alleged misdeeds to cover up decades of flawed environmental and natural resource stewardship at the hands of these Defendants.

101.    The Defendants' animus and vindictiveness toward Plaintiffs has previously manifested itself in the form of multiple NREPA violation letters having been issued without any specific NREPA provision specified and without any scientific substantiation proffered as support, including more than a dozen letters sent by Defendant agencies and/or Defendant

officials directly to FERC, all of which materially contributed to FERC's revocation of the Edenville Dam hydroelectric generation license.

102.   Consequently, Defendants' past and present administrative treatment of Plaintiffs, and MIAG's support of such behavior, has been completely without rationality, intended to stifle Plaintiffs' constitutionally protected right to free speech and to freely, but cautiously exercise their constitutionally protected rights to use their private property and to make a living in Michigan operating hydroelectric dams.

103.   Defendant agencies and officials have pretended to treat Plaintiffs fairly and equal to other relevant similarly situated dam owner-operators in the State of Michigan. However, to the best of Plaintiffs' knowledge and belief, there is not another hydroelectric dam owner-operator located in the State of Michigan that has been singled out and treated as poorly and unfairly as Plaintiff Mueller and his entities at the hands of Defendants EGLE-WRD and MDNR, and Defendants Rudolph, Pingel and Kruger.

104.   In other words, Plaintiff Mueller and the Plaintiff entities he co-manages for purposes of operating the Edenville Dam and three FERC-licensed hydroelectric dams, all four of which impound manmade reservoirs that benefit those local Michigan residents who use them for recreational purposes, have been treated differently than, and have been discriminated against unlike, any other Michigan-based hydroelectric dam owner-operator that provides the same public benefits elsewhere in the state.

105.   In sum, the ongoing administrative actions taken by Defendant agencies and Defendant officials against Plaintiffs both lack any rational basis and have been motivated by an animosity that violates Plaintiffs' constitutionally protected Fourteenth Amendment right to equal protection under the law. Such reprehensible conduct also betrays the professional

standards to which all public officials, including these Defendant agencies and Defendant officials, are sworn to uphold.

## COUNT VI – DECLARATORY RELIEF

106.    Plaintiffs hereby incorporate by reference the allegations set forth above as if fully set forth herein.

107.    Plaintiffs seek a declaratory judgment from this Court that Defendants' policies, practices and conduct as alleged herein violated have Plaintiffs' rights under the United States Constitution and accompanying Bill of Rights.

108.    Plaintiffs seek a declaratory judgment from this Court that FERC, and not Michigan state law, had set the appropriate duty of care for Plaintiffs' operation of the 95-year-old Edenville Dam, both during the term of the former Edenville Dam FERC license, and afterwards, to ensure both dam safety and public health and welfare, considering the ongoing prevailing physical conditions at the Edenville Dam site.

109.    Plaintiffs seek a declaratory judgment from this Court that paragraphs 6 and 7 of the NREPA Part 307 Court Order of May 28, 2019, which had together incorporated by reference the terms of the recent Edenville Dam FERC license, as amended or temporarily modified,[3] and not Michigan state law, had set the appropriate duty of care for Plaintiffs'

---

[3] *See, e.g.,* FERC Chicago Regional Engineer Ltr. to Boyce (9-9-13) (approving *inter alia* Boyce's pre-lowering of Wixom Reservoir interim mitigation solution); 162 FERC ¶ 61,007 (Jan. 5, 2018), at para. 17 (approving Boyce's use of the Edenville Dam powerhouse to pass waterflows during extreme cold weather periods as the preferred means to control the level of Wixom Reservoir in lieu of requiring dam operators, on grounds of dam safety, to employ only the Tainter gates which are prone to freezing for such purpose); 164 FERC ¶ 62,146 (Sept. 14, 2018), at paras. 23-26 (dispensing with the need to develop an MDNR-recommended mussel stranding survey and relocation plan given MDNR's failure to identify the known presence of federally-listed or state-listed organisms, to identify areas that are prone to stranding, to identify where stranding surveys are to be performed, and to identify the maximum number of organisms to be relocated, and instead requiring Boyce to immediately forward to FERC and MDNR its observations of significant strandings and any reports it received of strandings, and to temporarily stop a drawdown if notified by MDNR of a stranding event the agency believes could have significant population-level effects); 64 FERC ¶ 62,158 (Sept. 19, 2018), at paras. 1, 3, 6, Ordering paras. (A),(B) and (D) (approving Boyce's requested temporary variance to Wixom reservoir elevations to accommodate spillway and gate inspections at the upstream Smallwood Project, and reaffirming Boyce's obligations to notify MDNR of any observations or reports it receives of significant mussel strandings in the Wixom Reservoir, and to temporarily

operation of the 95-year-old Edenville Dam, in cooperation with the Four Lakes Task Force ("FLTF"), the Designated NREPA Part 307 Lake Level Authority for Gladwin and Midland Counties, during the 2019-2020 winter season, to ensure both dam safety and public health and welfare, considering the ongoing prevailing physical conditions at the Edenville Dam site, as then reported.

110.    Plaintiffs seek a declaratory judgment from this Court that Defendants EGLE-WRD and MDNR and Defendants Rudolph, Pingel and Kruger had been subject to the scientific and technical evidence reliability and relevance gatekeeping standards of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), for purposes of ensuring their compliance with MCL 324.1307(6)(a)-(c), when responding to the joint Part 301/303/307 permit application that Plaintiffs and FLTF had filed with the agencies on or about September 25, 2019.

111.    Plaintiffs seek a declaratory judgment from this Court that Defendants EGLE-WRD and MDNR and Defendants Rudolph, Pingel and Kruger have failed to establish, pursuant to  federal and state public notice and comment requirements, objective scientifically validated surveying, sampling and testing standards, methodologies, procedures and protocols these Defendant agencies imposed on the owner-operators of hydroelectric and non-hydroelectric dams in the State of Michigan for the purpose of protecting, preserving, and conserving freshwater mussels the State of Michigan has identified as being present in Michigan inland lakes, reservoirs and streams, including freshwater mussels that are federally listed as endangered or threatened species under pursuant to the Endangered Species Act.

---

stop a drawdown if notified by MDNR of a stranding event the agency believes could have significant population-level effects).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Enter judgment in their favor and against the Defendants in an amount in excess of $75,000, to be proven at trial, plus costs and other relief that this Court deems appropriate;

b.     Enter a declaratory judgment finding that Defendants' policies, practices and conduct as alleged herein violated have Plaintiffs' rights under the United States Constitution and accompanying Bill of Rights;

c.    Enter a declaratory judgment finding that FERC, and not Michigan state law, had set the appropriate duty of care for Plaintiffs' operation of the 95-year-old Edenville Dam, both during the term of the former Edenville Dam FERC license, and afterwards, to ensure both dam safety and public health and welfare;

d.    Enter a declaratory judgment finding that paragraphs 6 and 7 of the NREPA Part 307 Court Order of May 28, 2019 incorporated by reference the terms of the recent Edenville Dam FERC license, as amended or temporarily modified, and in so doing, set the appropriate duty of care for Plaintiffs' operation of the 95-year-old Edenville Dam;

e.    Enter a declaratory judgment finding that Defendants failed to comply with MCL 324.1307(6)(a)-(c), when responding to the joint Part 301/303/307 permit application that Plaintiffs and FLTF had filed with the agencies on or about September 25, 2019; and

f.    Enter a declaratory judgment finding that Defendants have failed to establish, pursuant to  federal and state public notice and comment requirements, objective

scientifically   validated     surveying,   sampling   and   testing   standards, methodologies, procedures and protocols these Defendant agencies imposed on the owner-operators of hydroelectric and non-hydroelectric dams in the State of Michigan for the purpose of protecting, preserving, and conserving freshwater mussels the State of Michigan has identified as being present in Michigan inland lakes, reservoirs and streams, including freshwater mussels that are federally listed as endangered or threatened species under pursuant to the Endangered Species Act.

Respectfully submitted,

/s/Daniel C. Curth
Goldstein & McClintock LLLP
Counsel for Plaintiffs
111 W. Washington Street, Suite 1221
Chicago, IL  60602
312.337.7700
danc@goldmclaw.com

THE KOGAN LAW GROUP, P.C.

By: /s/Lawrence A. Kogan
LAWRENCE A. KOGAN
(NY # 2172955)
Pro Hac Vice Admission Application To Be Submitted
100 United Nations Plaza, Suite # 14F
New York NY 10017
(212) 644-9240
lkogan@koganlawgroup.com