# EXHIBIT 12

Execution Copy

CASE - 272734

# MICHIGAN ECONOMIC DEVELOPMENT CORPORATION
# GRANT WITH
# COUNTY OF MIDLAND

The Michigan Economic Development Corporation (the "MEDC") enters into a binding agreement (the "Agreement") with County of Midland (the "Grantee"). As used in this Agreement, the MEDC and Grantee are sometimes individually referred to as a "Party" and collectively as "Parties."

**Grantee:**   County of Midland
220 West Ellsworth Street
Midland, MI 48640

I. **NATURE OF SERVICES.** The purpose of this Agreement is to provide funding to the Grantee to replace dams in Midland and Gladwin Counties for long term sustainability for various lakes within the counties ("Project") (the Project, together with the Grantee's Duties described in Section V, are collectively referred to as the "Grant Activities"). The Grantee agrees to undertake and perform the Grant Activities.

II. **PERFORMANCE SCHEDULE.**

Starting Date: January 1, 2019          Ending Date: January 31, 2021

The term of this Agreement shall commence on the Starting Date and shall continue until earlier terminated as permitted by this Agreement ("Term").

III. **PAYMENT SCHEDULE INFORMATION.**

A. The MEDC agrees to pay the Grantee a sum not to exceed $5,000,000 (the "Grant") as soon as practical after full execution of this Agreement by the Parties. This Agreement does not commit the MEDC to approve requests for additional funds during or beyond the Term. Provided however, if the Grantee is also a recipient of grant funds under one or more of a prior grant agreement authorized by any of PA 268 of 2016, PA 107 of 2017 and/or PA 207 of 2018, Grantee must first certify in writing to the Grant Administer that all such grant funds disbursed thereunder have been expended as required under the applicable prior grant agreement, before any of this Grant may be disbursed to Grantee.

B. MEDC requires that payments under this Agreement be processed by electronic funds transfer (EFT). Grantee is required to register to receive payments by EFT at the State Integrated Governmental Management Applications (SIGMA) Vendor Self Service (VSS) website

1

Scanned with CamScanner

(www.michigan.gov/VSSLogin).

IV. **MEDC GRANT ADMINISTRATOR.** The Grantee must communicate with the MEDC representative named below or his or her designee regarding this Agreement. The Grant Administrator may be changed, at any time, at the discretion of the MEDC.

> Kristyn Blackmer (the "Grant Administrator")
> Michigan Economic Development Corporation
> 300 North Washington Square
> Lansing, Michigan 48913
> blackmerk1@michigan.org

V. **GRANTEE DUTIES.** The Grantee agrees to undertake, perform, and complete the following duties:

  A. All Grant funds paid to the Grantee shall be spent by the Grantee for Grant Activities;

  B. As to any portion of the Project in which in excess of fifty percent (50%) of the Grant funds will be used by Grantee to pay any contractor or other independent third party, Grantee shall engage in a competitive bidding process, including, at a minimum, soliciting quotes from at least two (2) independent sources capable of performing the applicable portion of the Project;

  C. All Grant funds paid to Grantee shall be spent by the Grantee in accordance with the budget, attached as Exhibit A ("Budget"). Other than general administrative expenses necessary to implement the Project, the Budget shall not reflect additional general administrative expenses in excess of ten percent (10%) of the Grant, without the prior written consent of the Grant Administrator. Changes in the Budget will be allowed only upon prior review and written approval by the Grant Administrator; provided however, the Grantee may re-allocate expenditures up to ten percent (10%) within the categories of the Budget upon prior written notice to the Grant Administrator.

  D. Unless this Agreement is terminated prior to the Ending Date as permitted by this Agreement, the Grant Activities shall be completed no later than the Ending Date;

  E. Within fifteen (15) calendar days following the end of each calendar quarter, beginning with the calendar quarter ending 9/30/2019 and continuing through the first to occur of: (i) submission of the Final Progress Report (as defined below) or (ii) the calendar quarter 12/31/2020, the Grantee shall submit a written quarterly progress report to the Grant Administrator reporting (the below, collectively, "Quarterly Progress Report"):

2

Scanned with CamScanner

  i. a summary of the Grant Activities performed over the immediately prior calendar quarter;
  ii. An accounting of Grantee's actual expenditure of all funds on the Project over the immediately prior quarter, including the breakdown of Grantee's actual use of Grant funds on the Project within each applicable category of the Budget, and corresponding copies of supporting documentation of such expenditures, such as receipts, general ledgers, or other evidence of expenditure activity statements;
  iii. the Grantee's then estimated percentage of completion of the Project; and
  iv. Any other information deemed relevant by Grantee to support the Grant Activities actually performed.

F. Upon the first to occur of: (i) Grantee's completion of the Project or (ii) 01/31/2021, the Grantee shall submit a written final progress report to the Grant Administrator reporting (the below, collectively, "Final Progress Report"):
  i. An accounting of Grantee's actual expenditure of all funds on the Project from the date of the immediately prior Quarterly Progress Report, including the breakdown of Grantee's actual use of Grant funds on the Project within each applicable category of the Budget, and corresponding copies of supporting documentation of such expenditures, such as receipts, general ledgers, or other evidence of expenditure activity statements;
  ii. A comprehensive narrative of all of the Grant Activities, including a summary about the completed Project and its impact on the community in which the Project is located;
  iii. the Grantee's then estimated percentage of completion of the Project;
  iv. One or more photos evidencing the completed Project; and
  v. Any other information deemed relevant by Grantee to support the Grant Activities actually performed.

G. Beginning with Grantee's fiscal year in which the Grant is disbursed and within ninety (90) calendar days of the end of Grantee's fiscal year thereafter through the earlier to occur of the Grantee's fiscal year: (i) in which a Final Progress Report has been submitted as required hereunder or (ii) the last year of the Term, the Grantee shall submit a copy of its annual financial statements which financial statements must be audited by an independent certified public accountant.

H. The Grantee shall submit such other and further information about the Project and documentation of the expenditures of Grant funds as reasonably requested by the MEDC; and

I. Upon expiration of the Term, or earlier termination as provided by this Agreement, in addition to all other remedies available to the MEDC, any

Scanned with CamScanner

portion of Grant funds paid to Grantee and not expended by the Grantee in accordance with this Agreement shall be returned by the Grantee to the MEDC.

VI. **RELATIONSHIP OF THE PARTIES.**

  A. Neither Grantee nor any of its employees or agents is or shall become an employee of the MEDC due to this Agreement.

  B. Grantee will perform the Grant Activities free from the direction or control of the MEDC as to means and methods of performance.

  C. The MEDC is not responsible for any insurance or other fringe benefits, including, but not limited to, Social Security, Worker's Compensation, income tax withholdings, retirement or leave benefits, for Grantee or its employees. Grantee assumes full responsibility for the provision of all such insurance coverage and fringe benefits for its employees.

  D. All tools, supplies, materials, equipment, and office space necessary to carry out the services described in this Agreement are the sole responsibility of Grantee unless otherwise specified herein.

  E. Grantee shall retain all control of its employees and staffing decisions independent of the direction and control of the MEDC.

VII. **TERMINATION.** This Agreement shall terminate upon the earlier of the following:

  A. The Ending Date;

  B. Termination by the MEDC, by giving thirty (30) calendar days prior written notice to the Grantee. In the event that the Legislature of the State of Michigan, the State Government, or any State official, commission, authority, body, or employee or the federal government (a) takes any legislative or administrative action which fails to provide, terminates, or reduces the funding necessary for this Agreement; or (b) takes any legislative or administrative action, which is unrelated to the source of funding for the Grant, but which affects the MEDC's ability to fund and administer this Agreement and other MEDC programs, provided, however, that in the event such action results in an immediate absence or termination of funding, cancellation may be made effective immediately upon delivery of notice to the Grantee;

  C. Termination by the MEDC pursuant to Section XIV of this Agreement; or

  D. Written agreement of the Parties.

Scanned with CamScanner

VIII. **MEDC EMPLOYEES.** The Grantee will not hire any employee of the MEDC to perform any obligations of Grantee covered by this Agreement without prior written approval from the Chief Executive Officer of the MEDC.

IX. **CONFLICT OF INTEREST.** Except as has been disclosed to the MEDC, Grantee affirms that neither the Grantee, nor any of its officers, directors, employees, or affiliates have, shall have, or shall acquire any contractual, financial, business or other interest, direct or indirect, that would conflict in any manner with Grantee's performance of its obligations under this Agreement or otherwise create the appearance of impropriety with respect to this Agreement.

Grantee further affirms that neither Grantee nor any of its officer, directors, employees, or affiliates have accepted, shall accept, have offered, or shall offer, anything of value to influence the MEDC, its Corporate Board, Executive Committee and their respective directors, participants, officers, agents and employees. Grantee shall not attempt to influence any MEDC employee by the direct or indirect offer of anything of value. Grantee also affirms that neither Grantee, nor its Affiliates or their employees has paid or agreed to pay any person, other than bona fide employees and consultants working solely for Grantee or its affiliate, any fee, commission, percentage, brokerage fee, gift or any other consideration contingent upon or resulting from the execution of this Agreement.

In the event of change in either the interests or services under this Agreement, Grantee will inform the MEDC regarding possible conflicts of interest which may arise as a result of such change. Grantee agrees that conflicts of interest shall be resolved to the MEDC's satisfaction or the MEDC may terminate this Agreement. As used in this Paragraph, "conflict of interest" shall include, but not be limited to, conflicts of interest that are defined under the laws of the State of Michigan.

X. **INDEMNIFICATION AND GRANTEE LIABILITY INSURANCE.** To the extent permitted by law, the Grantee shall indemnify, defend and hold harmless the MEDC, its Corporate Board, Executive Committee, and their respective directors, participants, officers, agents and employees from any damages that it may sustain by any acts or omissions pertaining to the Grant Activities. The Grantee shall maintain such insurance to protect the Indemnified Persons from claims that might arise out of, or as a result of, the Grant Activities and Grantee's operations; however, Grantee's indemnification obligations under this Agreement shall not be limited to the limits of liability imposed under the Grantee's insurance policies. The Grantee will provide and maintain its own general liability, property damage, and workers compensation insurance.

XI. **ASSIGNMENT/TRANSFER/SUBCONTRACTING.** The Grantee shall not assign, transfer, convey, subcontract, or otherwise dispose any interest of the Grantee under this Agreement without the prior written consent of the MEDC.

Scanned with CamScanner

XII. **COMPLIANCE WITH LAWS.** The Grantee is not, and will not during the Term, be in violation of any laws, ordinances, regulations, rules, orders, judgments, decrees or other requirements imposed by any governmental authority to which it is subject, and will not fail to obtain any licenses, permits or other governmental authorizations necessary to carry out its duties under this Agreement.

XIII. **DEFAULT.** The occurrence of any one or more of the following events or conditions shall constitute an "Event of Default" under this Agreement, unless a written waiver of the Event of Default is signed by the MEDC: (a) any representation, covenant, certification or warranty made by the Grantee shall prove incorrect at the time that such representation, covenant, certification or warranty was made in any material respect; or (b) the Grantee's failure to comply with any of its obligations or duties under this Agreement, including the Grantee's Duties.

XIV. **AVAILABLE REMEDIES.** Upon the occurrence of any one or more of the Events of Default: (a) the MEDC may suspend any MEDC obligation to make any payments under this Agreement, and (b) in the sole discretion and at the option of the MEDC, the MEDC may terminate this Agreement immediately upon notice to the Grantee. The termination of this Agreement is not intended to be the sole and exclusive remedy in case any Event of Default shall occur and each remedy, including seeking damages for breach of this Agreement, shall be cumulative and in addition to every other provision or remedy given herein or now or hereafter existing at law or equity.

XV. **ACCESS TO RECORDS AND INSPECTION RIGHTS.** During the Term and for a period of three (3) years following the end of the Term, the Grantee shall retain reasonable records related to the Grant Activities, including records evidencing that the Grant Activities were actually performed and the identity of all persons and entities that are paid any portion of the Grant funds. There will be frequent contact between the Grant Administrator and the Grantee. To monitor and ensure compliance with the terms of this Agreement, the Grantee shall permit the MEDC and/or the Auditor General of the State of Michigan ("Auditor General") to visit the Grantee, the Project location, and any other location where books and records of the Grantee are normally kept, to inspect the Project, the books and records, including financial records and all other information and data relevant to the terms of this Agreement, including the expenditure of the Grant disbursements; provided, however, that such inspection and audit rights shall survive the end of the Term by three (3) years. At such visits, the Grantee shall permit any employee or agent of the MEDC and/or the Auditor General to make copies or extracts from information and to discuss the Project, the affairs, finances, and accounts of the Grantee related to this Agreement with its officers, employees, or agents. The MEDC and/or the Auditor General shall have the right to remove, photocopy, photograph, or otherwise record in any way any part of such books and records with the prior written consent of the Grantee, which consent shall not be unreasonably withheld.

XVI. **GOVERNING LAW.** This Agreement is made and entered into in the State of Michigan and shall in all respects be interpreted, enforced, and governed under the

Scanned with CamScanner

laws of the State of Michigan without regard to the doctrines of conflict of laws.

XVII. **NOTICES.** Any notice, approval, request, authorization, direction or other communication under this Agreement shall be given in writing and shall be deemed to have been delivered and e-mailed, or faxed, or mailed by first class, postage prepaid, or sent by express, overnight courier to the respective Party at the e-mail, fax or physical addresses as last known or otherwise reasonably identified by the notifying Party. The MEDC and Grantee may, by notice given hereunder, designate any further or different addresses to which subsequent notices shall be sent.

XVIII. **TOTAL AGREEMENT.** This Agreement, including Exhibit A, is the entire agreement between the Parties as to the subject matter of this Agreement.

XIX. **SURVIVAL.** The terms and conditions of sections VI, X, XV, XVI, XVII, XVIII and XIX shall survive the expiration, or earlier termination, of the Term.

XX. **COUNTERPARTS AND COPIES.** This Agreement may be signed in one or more counterparts, and such signatures may be electronically delivered, and in such circumstances, shall be considered one document and an original for all purposes.

(SIGNATURE PAGE FOLLOWS)

Scanned with CamScanner

# EXHIBIT A

# GRANTEE'S BUDGET

## Michigan Enhancement Grant Project Budget

Please enter the major cost elements of the project, selecting from the drop down list options. If you select an activity with a ":" please add a few additional words of description in the "Other/Additional Notes" column. You will be asked to report based on these budget categories. It is recommended that the budget have between 2-5 line items. Keeping the budget at a fairly high-level minimizes the need to amend the budget if the project costs deviate slightly from the plan. The "Local" and "Other" columns are optional. Six line items is the maximum allowed.

| 1. Grantee: The County of Midland | | 2. Project Title: Four Lakes Dams | | | |
|---|---|---|---|---|---|
| 3. Project Cost Elements | | 4. Funding Sources: MEDC Grant & Four Lakes Special Assessment District | | | |
| Activities | Other/Additional Notes | Special Legislative Grant | Local Funding | Other Funding | Total |
| Other: | Property Acquisition | $ 3,000,000.00 | $ 7,400,000.00 | | $ 10,400,000.00 |
| Consultants/Outside Contractors | Lake Level Hearing, Special Assessement District formation, Engineering Design, Permitting, Bidding, Computation of Cost, and Special Assessment Hearing | $ 1,500,000.00 | | | $ 1,500,000.00 |
| Construction: | Repairs and Improvements (Gate Repairs needed before winter) | $ 500,000.00 | $ 2,600,000.00 | | $ 3,100,000.00 |
| Construction: | Part 315 Improvements | | $ 2,700,000.00 | | $ 2,700,000.00 |
| Construction Contingency | | | $ 1,500,000.00 | | $ 1,500,000.00 |
| Other: | Capitalized Interest | | $ 800,000.00 | | $ 800,000.00 |
| Total | | $ 5,000,000.00 | $ 15,000,000.00 | $ - | $ 20,000,000.00 |

A-1

Scanned with CamScanner