# EXHIBIT 22

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30TH JUDICIAL CIRCUIT
INGHAM COUNTY

THE MICHIGAN DEPARTMENT OF
ENVIRONMENT, GREAT LAKES, AND
ENERGY; AND THE MICHIGAN
DEPARTMENT OF NATURAL RESOURCES,

Plaintiffs,

v

LEE MUELLER; BOYCE MICHIGAN, LLC;
EDENVILLE HYDRO PROPERTY, LLC;
BOYCE HYDRO POWER LLC; BOYCE
HYDRO, LLC; WD BOYCE TRUST 2350; WD
BOYCE TRUST 3649; WD BOYCE TRUST
3650; STEPHEN B. HULTBERG; AND
MICHELE G. MUELLER,

Defendants.

No. 20-            -CE

HON. _____

**VERIFIED COMPLAINT**

_____

Nathan A. Gambill (P75506)
Danielle Allison-Yokom (P70950)
Assistant Attorneys General
Attorneys for Plaintiffs
Michigan Department of Attorney General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
gambilln@michigan.gov
allisonyokomd@michigan.gov

_____/

Litigation is currently pending between the parties. Plaintiffs filed an action in the Ingham County Circuit Court, Case No. 20-255-CE, arising out of the Defendants' past mismanagement of the Edenville Dam that resulted in significant natural resource damages to the State. Defendants filed a notice of removal to the U.S. District Court for the Western District of Michigan on June 6, 2020, Case No. 2:20-cv-00520. Some of the Defendants have also filed an action in the U.S. District Court for the Western District of Michigan, Case No. 1:20-cv-00364, against the Plaintiffs in this matter.

## VERIFIED COMPLAINT

The above-named Plaintiffs, by their attorneys, Dana Nessel, Attorney General of the State of Michigan, and Nathan A. Gambill and Danielle Allison-Yokom, Assistant Attorneys General, state as follows:

## INTRODUCTION

1.    This lawsuit is about the Defendants' gross mismanagement of their hydroelectric dam and their indifference to public safety.  Defendants refused to adequately repair their dam despite years of warnings from the federal government that their failure to act could be catastrophic.  Ultimately, Defendants' mismanagement resulted in one of the worst flooding disasters in Michigan history. This lawsuit seeks to hold Defendants accountable for the injuries they have caused the public and to vindicate the rights of the public to be safe and secure in their homes and businesses.  This suit seeks civil fines against the Defendants for their gross mismanagement of their dams and the harm that it has caused to the public, as well as monetary relief for the damage caused to the public's natural resources, and equitable and prospective relief to restore the harm that was done and to ensure that it does not happen again.

## PARTIES, VENUE, AND JURISDICTION

2.    The Michigan Department of Environment, Great Lakes, and Energy (EGLE) is the agency tasked with enforcing Michigan's environmental laws, including Part 31, Part 301, Part 303, and Part 315 of the Natural Resources and

Environmental Protection Act (NREPA), MCL 324.30101 et seq., MCL 324. 30301 et seq., and MCL 324.30315 et seq.

3.      The Michigan Department of Natural Resources (DNR) is the agency that manages the fish and wildlife in Michigan, which by law belong to the public. MCL 324.40105; MCL 324.48702(1).

4.      Edenville Hydro Property, LLC owns the Edenville dam.

5.      Boyce Michigan, LLC owns property on which the dam's operation depends.

6.      Boyce Hydro, LLC operates the Edenville dam.

7.      Boyce Hydro Power, LLC operates and funds the Edenville dam and formerly held a licensed issued by the Federal Energy Regulatory Commission.

8.      WD Boyce Trust 2350, is a member of Edenville Hydro Property, LLC; a member of Boyce Michigan, LLC; a member of Boyce Hydro, LLC; and a member of Boyce Hydro Power, LLC.

9.      WD Boyce Trust 3649, is a member of Edenville Hydro Property, LLC; a member of Boyce Michigan, LLC; a member of Boyce Hydro, LLC; and a member of Boyce Hydro Power, LLC.

10.     WD Boyce Trust 3650, is a member of Edenville Hydro Property, LLC; a member of Boyce Michigan, LLC; a member of Boyce Hydro, LLC; and a member of Boyce Hydro Power, LLC.

11.     Lee W. Mueller is sued personally and as member and co-manager of Edenville Hydro Property, LLC; as member and co-manager of Boyce Michigan,

3

LLC; as member, employee, and co-manager of Boyce Hydro, LLC; as member and co-manager of Boyce Hydro Power, LLC; as co-trustee and beneficiary of WD Boyce Trust 2350; as co-trustee and beneficiary of WD Boyce 3649; and as co-trustee and beneficiary of WD Boyce Trust 3650. Mr. Mueller entirely controls the dam and controls each of the LLC entities named as defendants through the trust entities of which he is both a trustee and beneficiary.

12.    Stephen B. Hultberg is sued personally and as member and co-manager of Edenville Hydro Property, LLC; as member and co-manager of Boyce Michigan, LLC; as member, employee, and co-manager of Boyce Hydro, LLC; as member and co-manager of Boyce Hydro Power, LLC; as co-trustee and beneficiary of WD Boyce Trust 2350; as co-trustee and beneficiary of WD Boyce 3649; and as co-trustee and beneficiary of WD Boyce Trust 3650.

13.    Michele G. Mueller is sued personally and as member of Edenville Hydro Property, LLC; as member of Boyce Michigan, LLC; as member and employee of Boyce Hydro, LLC; and as member of Boyce Hydro Power, LLC.

14.    Venue is appropriate in this Court, and this Court has jurisdiction, because this action is "brought by the attorney general in the name of the state or of the people of the state, for the use and benefit thereof," so it is "as though the cause of action arose in" Ingham County. MCL 14.102; see also MCL 600.1631. Additionally, the violation of a statute passed to benefit the public welfare is a public nuisance, and circuit courts have jurisdiction over actions to abate public nuisances. MCL 600.2940(1).

## GENERAL ALLEGATIONS

15.    This disaster was the product of years of mismanagement and knowing, willful disregard for public safety on the part of the Defendants.  As set forth below, for well over a decade the Defendants violated federal dam safety laws and put profits ahead of safety—all the while pocketing the money they earned through the use of the public's waterways.  Defendants' malfeasance culminated in the catastrophic failures of the Edenville and Sanford Dams.

16.    Michigan's Constitution declares the "conservation and development of the natural resources of the state" to be "of paramount public concern in the interest of the health, safety and general welfare of the people."  1963 Const, art 4, § 52. Accordingly, it orders the Legislature to "provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction."  *Id.*

17.    Because these resources belong to the public, when persons use the resources to earn money, they owe a duty to the public to serve the public's interest. Here, Defendants earned money from exploiting the power of the public's waterways, so they had a duty to protect the public safety and to not destroy the public's natural resources.

18.    To carry out its constitutional mandate, the Legislature created the Natural Resources and Environmental Protection Act, MCL 324.101 et seq. Defendants' actions implicate several provisions of that Act, including at the very least Part 17 (Environmental Protection Act), Part 31 (Water Resources Protection),

5

Part 301 (Inland Lakes and Streams), Part 315 (Dam Safety), Part 401 (Wildlife Conservation), and Part 487 (Sport Fishing).

**Wixom Lake and the Edenville Dam**

19.    Wixom Lake is an artificial impoundment formed by the Edenville Dam at the confluence of the Tobacco and Tittabawassee Rivers.  It is one of four impoundments created by four dams.  The other three dams are the Smallwood, Secord, and Sanford Dams.

20.    The Edenville dam consists of earthen embankments, totaling about 6,600 feet in length and having a maximum height of 54.5 feet.

21.    The Edenville Dam spans the Tittabawassee and Tobacco rivers.

22.    The Edenville dam created Wixom Lake, a 2,600-acre reservoir with a normal storage capacity of 36,000 acre-feet and a maximum storage capacity of 66,000 acre-feet.

23.    The Edenville Dam is owned, controlled, or operated by Defendants and Boyce Hydro Power held a license issued by the Federal Energy Regulatory Commission (FERC), and until September 25, 2018, the dam was a licensed hydroelectric generating facility.

24.    Because the Edenville Dam, like the other dams owned and operated by the Defendants, was a licensed hydroelectric generating facility, its safety was entirely regulated by FERC.  The State of Michigan had no regulatory authority over the safety of the dam while the license was in effect.

6

25.    FERC assigned the Edenville Dam a high hazard potential rating because failure to properly maintain and operate the dam posed a significant potential for loss of life and destruction of property, specifically to the Village of Sanford, Northwood University, City of Midland, and other downstream areas.

26.    Because of the high hazard potential rating, Boyce Hydro Power's FERC license required sufficient spillway capacity to prevent Wixom Lake from rising to a level that would endanger safety in the event of a probable maximum flood.  A probable maximum flood is a flood that may be expected from the most severe combination of critical meteorologic and hydrologic conditions that is reasonably possible in the drainage basin.  A dam's spillway is the structure designed to convey upstream river flows through the dam to the downstream channel.  Spillway capacity is how much flow a dam can safely pass prior to water flowing over parts of the dam not designed to be overtopped.

27.    FERC also required Defendants to maintain and make other improvements to the dam to reduce the risk of failure, such as toe drain maintenance ensuring the stability of the dam's embankment—including the portion of the embankment that ultimately failed.

28.    Because the State had no regulatory authority over the safety of Edenville Dam and much of the information related to the Dam was classified as Federal Critical Infrastructure Information, the State had limited knowledge of FERC's concerns related to the Dam's safety and spillway capacity during FERC's jurisdiction over the Dam.

**Boyce Hydro Power's "appalling" indifference to the need to increase spillway capacity of Edenville Dam.**

29.    According to a series of orders issued by FERC beginning in 2017 that explain the background of FERC's warning to Defendants, the Edenville Dam's previous owner was notified by the federal government as early as August 6, 1993 that the dam's spillway capacity was not adequate and needed to be increased.

30.    Defendants acquired the dam, and Boyce Hydro Power (previously Synex Michigan, LLC) acquired the FERC license to operate the Edenville Dam on June 23, 2004, knowing that the spillway capacity would need to be increased. Defendants also knew that the dam's embankments would need to be maintained and strengthened, and that other ongoing maintenance and repairs would be necessary.

31.    Defendants were informed by FERC that the Edenville Dam's spillway capacity was insufficient and that they were required to increase the spillway capacity to 100% of a probable maximum flood.

32.    On June 10, 2004, FERC's Regional Engineer sent Defendants a letter informing them of significant outstanding dam safety work items, including insufficient spillway capacity at the Edenville Dam.

33.    Specifically, the letter indicated:

The Edenville Project does not have sufficient spillway capacity to safely pass the flood flows.  Failure of Edenville during flood flows constitutes a hazard to downstream life and property.  The design report for the Edenville spillway increase is due September 2004 and construction is scheduled for 2005–2006 (one dam to be remediated each year). **Any delay in completing the spillway capacity increase constitutes a risk to the public and is not acceptable**.

8

34.    Defendants did not increase the Edenville spillway as required by FERC's June 10, 2004 letter.

35.    Defendants took superficial actions over the years to comply, but never did.  Additionally, while Defendants took some actions to improve stability of portions of the dam's embankment, they neglected other portions—including the portion that ultimately failed.

36.    FERC tried for years to persuade Defendants to comply, meeting with them approximately 13 times between 2005 and 2009.

37.    In 2008 Defendants proposed upgrading the spillway over a three-year period.  As part of that proposal, Defendants promised to put some of the revenues they generated from the dam into escrow to fund the work necessary to increase the spillway capacity.

38.    On February 9, 2009, FERC's Regional Engineer sent Defendants a letter accepting their proposal to upgrade/repair the Edenville spillway over a three-year period beginning in 2010.

39.    Defendants did not upgrade or repair the Edenville spillway as set forth in their proposal.

40.    Defendants did not put some of their revenues into escrow to fund the spillway improvements, violating their promise.

41.    In 2013, Defendants proposed constructing two auxiliary spillways in 2014 and 2015.

42.    Again, Defendants failed to construct the two auxiliary spillways.

9

43.    On July 22, 2014, FERC's Regional Engineer sent Defendants a proposed schedule, requiring construction to commence on August 8, 2015; completion of mitigation solutions by November 14, 2015; and requiring final plans and recommendations to resolve long-term capacity issues by December 15, 2015. Defendants responded that FERC's schedule was acceptable.

44.    Despite accepting FERC's schedule, Defendants failed to meet the timeline.

45.    On December 5, 2014, FERC's Regional Engineer set another timeline for Defendants to complete two auxiliary spillways—requiring the Tobacco auxiliary spillway to be completed by November 14, 2015 and the Tittabawassee auxiliary spillway to be completed by December 31, 2015.

46.    Defendants again failed to meet FERC's timeline.

47.    FERC's efforts over thirteen years failed to bring Defendants into compliance, and on June 15, 2017, FERC issued Defendants a Compliance Order requiring them to address their insufficient spillway capacity at the Edenville Dam.

48.    FERC characterized Defendants' actions as follows:

> Thirteen years after acquiring the license for the project, the licensee has still not increased spillway capacity leaving the project in danger of a [probable maximum flood] event.  The licensee **has shown a pattern of delay and indifference** to the potential consequences of this situation.  A situation that **must be remedied in order to protect life, limb, and property**.

49.    In addition to Defendants' thirteen-year failure to address the spillway and potential maximum flood issues at the Edenville Dam, FERC's compliance order noted that Defendants repeatedly (1) submitted inadequate filings; (2) failed

to exercise due diligence in obtaining permits; (3) performed unauthorized dam repair work and earth moving activities; (4) failed to comply with FERC's directives to file adequate public safety plans; (5) failed to construct approved recreational facilities; (6) failed to clarify property rights; and (7) failed to comply with the project's water quality monitoring plan.

50.    FERC noted Defendants' numerous, ongoing and egregious violations, and that despite FERC's flexibility, Defendants had made "no progress," and that Defendants' "**disregard for the severity of this situation is appalling**."

51.    The Compliance Order required Boyce Hydro to come into compliance and specifically included requirements to (1) complete a design package for the Tobacco auxiliary spillway within 30 days; (2) file plans to construct a Tittabawassee auxiliary spillway within 60 days; (3) file a plan and schedule to meet 100% probable maximum flood within 120 days; and (4) file complete plans and specifications for permanent repairs to both the left and right Tobacco abutment spillway walls within 45 days.

52.    Defendants failed to meet any of the deadlines in FERC's Compliance Order.

53.    Based on Defendants' continued failure to comply with FERC's license requirements, and, in particular, their failure to address FERC's safety concerns because the Edenville Dam was unable to meet 100% probable maximum flood, FERC proposed revoking Boyce Hydro Power's license on February 15, 2018.

54.    FERC found that Defendants admitted they had failed to comply with most of the obligations in the Compliance Order.

55.    FERC additionally found that Defendants' failure to meet the obligations in the Compliance Order was part of a long history of non-compliance:

> Boyce Hydro has failed for many years to comply with significant license and safety requirements, notwithstanding having been given opportunities to come into compliance.  The Compliance Order set out specific parameters for Boyce Hydro to achieve compliance with its license.  Boyce Hydro failed to meet nearly all the obligations in the Compliance Order, even after Commission staff granted multiple extensions.

56.    On September 10, 2018, FERC finally revoked Boyce Hydro's license (to be effective September 25, 2018), citing Boyce Hydro's "longstanding failure to increase the project's spillway capacity to safely pass flood flows, as well as its failure to comply with its license, Commission regulations, and a June 15, 2017 Compliance Order."

57.    FERC was particularly concerned with the Edenville Dam's inability to pass the probable maximum flood because the dam had inadequate spillway capacity.  But the stability of the dam's toe drain and embankment was also an issue of major concern over the years.

58.    In its revocation, FERC recognized the repetitive and willful nature of Boyce Hydro's violations:

> In sum, Boyce Hydro has, for more than a decade, **knowingly and willfully refused** to comply with major aspects of its license and the Commission's regulatory regime, with the result that public safety has been put at risk and the public has been denied the benefits, particularly project recreation to which it is entitled.  The record demonstrates that there is no reason to believe that [Defendants] will

come into compliance; rather, the [Defendants have] **displayed a history of obfuscation and outright disregard of its obligations**.

**Defendants placed profits over public safety and the public's interest.**

59.    For more than fourteen years, Defendants earned millions of dollars by using Michigan's natural resources—namely, the power of Michigan's waterways. This created a duty to protect the public from potential threats posed by the dam and to serve the public's interest in exchange for their use of the public's natural resources.  Yet Defendants violated that duty and abdicated their responsibilities. Instead, it was only about money for Defendants.  For example, FERC noted on January 17, 2019, that while Defendants "claimed that [they were] not financially capable of meeting [FERC] requirements," they "continued to benefit from the revenues generated by the project."

60.    As an example of Defendants' bad faith, FERC's January 17, 2017 compliance order caused Defendants to actually begin work on increasing the dam's spillway capacity.

61.    But when FERC issued another order proposing the revocation of Boyce Hydro Power's license in February 2018, Defendants *stopped the work on increasing the spillway capacity*.

62.    Defendants insisted that if the dam could not earn them money, *they had no reason to increase its spillway capacity*—despite knowing their failure to do so put the public at catastrophic risk.

63.    Defendants' disregard caused FERC to note that Defendants' action was a sign they were not acting in "good faith."

13

64.    Defendants repeatedly insisted to FERC that they simply could not afford to increase the dam's spillway capacity, but refused to substantiate their claims with any evidence.

65.    FERC requested information about Defendants' assets and liabilities, but Defendants refused, insisting that information was "private and confidential," and that FERC should just take their word for it.

66.    FERC refused to do so, concluding in a January 17, 2019 order that Boyce was not "credible," and that its "claims of financial hardship are not compelling."

67.    Once FERC finally revoked Boyce Hydro Power's license because of Defendants' appalling disregard for their public safety responsibilities, jurisdiction over the dam's safety suddenly shifted to EGLE.

**The sudden transfer of regulatory authority from FERC to EGLE.**

68.    Dams that do not generate hydroelectric power are regulated by the State through EGLE.  Therefore, by revoking Boyce Hydro's license, FERC effectively washed its hands of the matter and turned over regulation of the Edenville Dam, for the first time, to EGLE.

69.    EGLE's authority to regulate dam safety is found in Part 315 (Dam Safety) of the Natural Resources and Environmental Protection Act, MCL 324.31501 et seq.

70.    But when regulatory authority was abruptly transferred to EGLE from FERC, EGLE was unaware of the full extent of Defendants' past mismanagement of

14

the dam because much of the information related to the Edenville Dam was protected from release under federal critical infrastructure laws.

71.    EGLE staff performed a visual inspection of the dam on October 4, 2018, shortly after FERC withdrew its jurisdiction to determine whether there were obvious signs the dam's structural integrity would imminently fail.  EGLE found the dam in "fair structural condition."  Notably, though FERC had serious concerns about the failure of Defendants to perform necessary improvements to the dam, it expressly chose not to mandate the removal of the Edenville Dam for safety or any other reason.

72.    The October 4, 2018 visual inspection was intended to be a preliminary inspection for major structural issues and was not meant to determine whether the dam's spillway had sufficient capacity to satisfy Michigan dam safety laws.  On January 4, 2019, Defendants provided a signed and sealed finding by their engineer that the dam did satisfy Michigan's spillway capacity requirements.  But EGLE staff was continuing to analyze the question and was waiting for additional analyses and a full inspection report to assist with the issue.

73.    Part 315 requires dam owners to employ licensed professional engineers to conduct inspections, evaluate the condition of the dam, and submit inspection reports to EGLE.  MCL 324.31518(1).  EGLE staff requested the preparation of an inspection report under Part 315.

74.    EGLE staff began the task of obtaining many years' worth of previously unavailable records and inspection reports from FERC.  The process was

15

time consuming.  Defendants provided background documentation to EGLE.  But staff was also required to submit requests under the Freedom of Information Act to FERC and sign nondisclosure agreements in order to comply with federal regulations regarding the protection of information related to critical energy infrastructure.

75.    Once FERC finally revoked Boyce Hydro Power's license because of Defendants' appalling disregard for their public safety responsibilities, two series of events unfolded on parallel paths:  local stakeholders took the initiative to purchase the dam and repair it with the help of a $5,000,000 grant from the State; and local stakeholders obtained a court order requiring Defendants to maintain Wixom Lake at a consistent level during winter and summer months.

**Local stakeholders organize to purchase and repair Edenville Dam with assistance from a $5,000,000 State grant.**

76.    As shown by FERC's inability to force Defendants to bring the Edenville Dam into compliance with regulations, enforcing dam safety laws against unwilling private dam owners takes many years.

77.    In the past, it has taken as long as a decade for EGLE to force an unwilling dam owner to repair or remove a dam through litigation—and that is even when the taxpayers fund the repair or removal.

78.    Fortunately, there was a much quicker option available in this circumstance.  Defendants' gross mismanagement of its dams, including the Edenville and Sanford Dams, agitated local stakeholders to organize.  They formed

16

the Four Lakes Task Force (Task Force) and prepared a plan to purchase the dams, including Edenville Dam, and bring them into compliance with applicable FERC and state regulations.

79.    The Task Force is made up primarily of property owners who use and depend on the four impoundments formed by the Smallwood, Edenville, Sanford, and Secord Dams in Gladwin and Midland Counties, which included Wixom Lake.

80.    The Task Force planned to fix the Edenville Dam and increase its spillway capacity to meet FERC regulations both because they wanted to ensure that Wixom Lake continued to exist, and because they intended to obtain a new FERC license so Edenville Dam could be used to generate revenue to offset the cost of maintaining the dam.

81.    The State provided a $5,000,000 grant to support the Task Force's efforts.  Additionally, the Task Force planned to raise funds by issuing bonds through Gladwin and Midland Counties, collecting a special assessment levied from property owners on the four lakes, and collecting revenue from the hydroelectricity sold by the other three FERC licensed dams in the four lakes system.

82.    The Task Force would then use the funds to purchase, maintain, and repair Edenville Dam and the other dams.

83.    Defendants were in active negotiations with the Task Force to sell Edenville Dam for many months leading up to and following FERC's revocation of the license for the dam.  Those negotiations included plans to make the necessary repairs to the Edenville Dam, including a plan to increase the dam's spillway

17

capacity so the Task Force could obtain a license from FERC to generate hydropower using the Edenville Dam.

84.    EGLE staff routinely supported the Task Force by providing technical assistance to the Task Force as it made plans to purchase and repair the Edenville Dam.  When EGLE staff requested a comprehensive inspection of the Edenville Dam to be prepared under Part 315, it was the Four Lakes Task Force that prepared it.  They performed the comprehensive inspection between June 2019 and March 2020, and provided a copy of the report to EGLE on June 4, 2020.

85.    In the meantime, Defendants and the Task Force ultimately executed an agreement for the Task Force to purchase Edenville and the other dams in the four lakes system on January 2, 2020, though ownership of the dams would not pass to the Task Force until approximately 2022.

86.    With assistance from EGLE and the Task Force's own engineers, the Task Force developed a construction schedule to do what Defendants had long refused to do: sufficiently stabilize the dam's embankment and increase the Edenville Dam's spillway capacity.

87.    The process a court might have ultimately ordered Defendants to undertake—sell the Edenville Dam so it could be repaired by competent managers—was well underway and moving at a much quicker rate than if EGLE were acting alone.

88.     But as explained below, despite the combined efforts of the Task Force,
EGLE, and Gladwin and Midland Counties, tragedy struck before the Task Force's
plans could be fully realized.

**The Task Force and local community take action to compel Defendants to maintain Wixom Lake at a consistent level, even during the winter months.**

89.     During the same time period that the Task Force was working to take
over and repair Edenville Dam, Defendants caused major damage to the people
whose homes and businesses rely on Wixom Lake and to Michigan's natural
resources by temporarily drawing Wixom Lake down over the winters of 2018–2019
and 2019–2020.

90.     Edenville Dam created the Wixom Lake impoundment nearly 100
years ago, and an entire community and economy have been built up around it.
Wixom Lake provides valuable recreational, aesthetic, and economic value to the
thousands of homeowners and business that rely on it.

91.     Wixom Lake is an "inland lake or stream" regulated under Part 301,
MCL 324.30101(i), and constitutes an "ecosystem" under Part 355,
MCL 324.35501(d).  The aquatic species that lived in the lake belonged to the
public.  MCL 324.48702(1).  According to the State's records, there are regulated
wetlands on and contiguous to Wixom Lake, such as the northern portions of both
the Tobacco side and Tittabawassee side impoundments, the marsh east of Heron
Cove, and others.

92.    Defendants had a duty not to harm public property or the rights of the public to use Wixom Lake or to injure Michigan's natural resources without the necessary permits.

93.    Despite that duty, without authorization, Defendants effectively drained Wixom Lake on a temporary basis during the winters of both 2018–2019 and 2019–2020.

94.    When FERC regulated Edeville Dam, it forbade Defendants from draining Wixom Lake during the winter months and required Defendants to keep Wixom Lake at a consistent level.  Defendants could not deviate from that level without permission from FERC.

95.    In the fall of 2018, Defendants disregarded their duty to the public and effectively drained the lake to avoid spending money to properly operate the Edenville Dam over the winter months.  Defendants then raised the lake again in the spring of 2019.

96.    Though Defendants raised the lake level in the spring, the local community had been shocked as they watched their lake turn into a mud pit, surrounded by hundreds of useless docks, and it frightened them that Defendants could effectively drain the lake over the winter.

97.    The empty lake was a cause of major concern in the community, and it was the primary reason the Task Force was formed.

98.    In October of 2018—shortly after Defendants temporarily drained Wixom Lake—Midland and Gladwin Counties both adopted formal resolutions

finding that in order to protect the public's health, safety, and welfare, and to protect the natural resources of the state, and to best preserve and protect the value of property around all four lakes, that it was necessary to acquire, repair, replace, improve, operate, and maintain the Sanford Lake Dam, the Edenville Dam, the Smallwood Dam, and the Secord Dam in order to maintain the normal lake levels as previously required by FERC.

99.    To that end, Midland and Gladwin Counties filed petitions in both the Midland and Gladwin Circuit Courts under MCL 324.30701, et seq., Inland Lake Levels (Part 307) to establish court-ordered levels for the four lakes, including Wixom Lake, and to create special assessment districts to pay for the costs of acquiring, repairing, operating, and maintaining the four dams.

100.    The Four Lakes Task Force participated in these proceedings and assisted and supported Midland and Gladwin Counties' petitions.

101.    EGLE is defined as an interested party under Part 307 and must receive notice of all lake-level petitions.  MCL 324.30701(g) and MCL 324.30707(3). It routinely appears in such proceedings, typically to review whether the proposed normal lake level is likely to cause harm to water quality or other natural resources.

102.    EGLE did not initiate the process for Wixom Lake and was not the petitioner in that action.  EGLE appeared, as it normally does, and did not support or oppose the lake levels the counties sought.  EGLE did not object to the counties' petition because the parties had already agreed to EGLE's only two conditions:  that

21

any permits required for work under the Part 307 orders be obtained prior to the work being done, and that the orders incorporate FERC's environmental protection provisions.

103.    DNR also appeared in the Wixom Lake Part 307 proceeding as an interested party because it owns land on the four lakes, but it did not make any substantive filings.  Like EGLE, it did not support or oppose the relief that the counties sought—it merely did not object.

104.    On May 28, 2019, the Midland Circuit Court entered a lake level order granting the relief sought by Midland and Gladwin Counties, and advocated for by the Four Lakes Task Force.  The Gladwin Circuit Court subsequently adopted the same order (referred to hereafter as "circuit court orders").

105.    The circuit court orders required Defendants to maintain Wixom Lake during the winter at the same level FERC had previously required.

106.    The circuit court orders also authorized Midland and Gladwin Counties to delegate authority to the Task Force to purchase Edenville Dam and collect assessments from property owners on the lake to help pay to maintain the dam.

107.    Despite the circuit court orders that required them to maintain Wixom Lake at a consistent level during the winter, Defendants effectively drained Wixom Lake again over the winter of 2019–2020.

108.    Defendants insisted that they needed to dramatically lower the lake levels in the winter to protect the Edenville Dam from ice buildup.  Ice was a bigger

challenge because Boyce could not pass flow through the powerhouse while not

generating hydropower.  Defendants asserted that since all flow must be passed

through the spillway gates, ice buildup would be more prevalent, and could

compromise the safety of the dam.  But ice is a concern to dam owners throughout

Michigan—including owners of non-hydroelectric dams—and they do not drain their

impoundments over the winter.  Other dam owners simply apply established

methods and technology to fight ice during the winter.  But Defendants did not

want to spend the money on such methods and technologies, so they temporarily

drained Wixom Lake over the winter and raised it again in the spring—just as they

had done in 2018–2019.

109.    Contrary to their misleading statements now that the Edenville Dam

has failed, Defendants never claimed they could not safely maintain Wixom Lake at

the level established by FERC and the circuit court orders in the *non-winter*

months.  In fact, Defendants advocated to FERC *against* a permanent drawdown.

They communicated to FERC that lowering Wixom Lake ahead of a large flood

event would have limited benefit in reducing risk of failure of the Edenville Dam.

That directly contradicts Defendants' recent assertions that the State somehow

prevented them from lowering the lake level ahead of the May 19, 2020 flood

event—a request that was never made by the Defendants—and that doing so would

have prevented failure of the dam.  It is also telling that they never sought

permission from the circuit courts to permanently draw down Wixom Lake.

Instead, Defendants' winter drawdowns were only meant to be *temporary*

23

drawdowns during the winter months because Defendants did not want to spend money on ice-fighting methods and technology. Only after Edenville Dam failed did Defendants' cast those *temporary winter* drawdowns as a public safety measure based on their concerns about *spring* flooding. This after-the-fact rationale contradicts Defendants' past communication to FERC and is completely disingenuous—which is consistent with Defendants' past malfeasance.

110. In sum, EGLE could have granted the temporary drawdown permit application Defendants submitted in the fall of 2019 and Defendants *still* would have filled Wixom Lake again in the spring of 2020 just as they always planned. EGLE's denial of the Defendants' 2019 temporary drawdown application had *nothing* to do with the spring 2020 level of Wixom Lake required by the circuit court orders.

**Edenville Dam fails just as Defendants had been warned that it would.**

111. As Defendants had always planned, they raised the level of Wixom Lake again in the spring of 2020 to comply with the circuit court orders. That included Defendants asking for a permit from EGLE to raise the lake level, as required by Part 301 of the NREPA.

112. At no time in 2019 or 2020 did any State agency or officer seek to compel Defendants to raise the level of Wixom Lake to its court-ordered level over Defendants' objection that they could not safely maintain that level during the non-winter months. As noted, Defendants never made any such objection.

113.    Plaintiffs' previously filed lawsuit did not try to compel Defendants to raise Wixom Lake to its non-winter levels.  Defendants' newfound claim to the contrary now that the Edenville and Sanford Dams have failed is false.

114.    The State's lawsuit filed by the Attorney General, at the request of EGLE and DNR, seeks to hold Defendants accountable for the *past damage* Defendants caused by their illegal lowering of Wixom Lake in 2018 and 2019.  The lawsuit seeks damages from Defendants for killing aquatic life as a result of the drastic yet temporary lowering of the lake's level in the winter of 2018 and 2019, as well as injunctive relief to forbid Defendants from performing *future drastic, temporary drawdowns during the winter months* without a permit.

115.    The lawsuit does not seek to return Wixom Lake to its non-winter levels, but instead seeks to address how the past temporary winter level drawdowns were conducted.  The fact that the lawsuit was filed *after* Defendants had already returned the lake to the non-winter level required by the circuit court orders further demonstrates that Defendants' current, self-serving characterizations of that lawsuit are false.

116.    Unfortunately, after Defendants raised Wixom Lake to the level required by the circuit court orders, tragedy struck.

117.    In the days leading up to and including May 19, 2020, storms moved through Midland and Gladwin Counties dropping an enormous amount of rain in a short period of time on already saturated ground, causing a major flooding event.

25

118.    By the evening of May 19, 2020, overwhelming flood flows ultimately resulted in the failure of the dam's earthen embankment—including the portion of the embankment Defendants had neglected to adequately maintain.

119.    The surge of water resulting from the failure caused hundreds of thousands of gallons of water per second to flow downstream, causing the failure of the Sanford Dam downstream, effectively destroying the Village of Sanford, and flooding a large number of homes and other buildings.

120.    The deluge also washed large amounts of potentially contaminated sediments, debris, garbage, and other harmful substances into the waters of the State, regulated bottomlands, regulated floodplains, and possibly into regulated wetlands.

121.    By information and belief, the deluge also killed fish and other animals owned by the State.

122.    If Defendants had completed all of the necessary repairs to their dam, it is reasonable to conclude that the dam's failure would not have occurred.

123.    FERC considered Defendants' "disregard" of their duty to the public to be "appalling," but now that the tragic event Defendants were warned about has occurred, Defendants' malfeasance is truly shocking.

124.    The complete human and environmental toll caused by Defendants' malfeasance remains to be fully realized and quantified, but there is no doubt it is devastatingly high.

125.    The deluge caused by Defendants' malfeasance has devasted lands and homes—including resources the State holds in trust for the public—and will reverberate into the future as the people who relied on Defendants put their lives back together.

126.    Defendants must be held accountable for using the public's natural resources to earn millions of dollars but violating the duty to the public that their use of those resources created.  Their violation of that duty has caused massive injury to the State's people, land, natural resources, and economy, including the public resources the State holds in public trust.

127.    Defendants' actions have caused Wixom Lake and its associated wetlands to cease to exist—they are effectively drained.  The lake and wetlands have been replaced by enormous mud flats.  Additionally, the diversion of the Tobacco River caused by the failure of the dam is causing ongoing erosion and natural resource damages, has transformed the remaining portion of the dam into a public safety hazard, and has interfered with the M-30 crossing, which has additional public safety implications because it is a major road in the area.  These are public nuisances that emanate from Defendants' land.

128.    Defendants' actions have created a public nuisance that must be abated.

129.    The path of destruction and debris downstream from Wixom Lake, including impacts caused by the failure of the Sanford Dam, also creates a public nuisance affecting thousands of people.

130.    Like Wixom Lake, the failure of the Sanford Dam caused Sanford Lake—and any wetlands reliant on it—to effectively drain, leaving a mud pit in its place, surrounded by useless docks.

131.    The public in general, the local governments affected by the flood, and the people who have built their lives and business around Wixom Lake and Sanford Lake and their associated wetlands for nearly 100 years have a right to be free from the nuisances caused by the failure of the Edenville Dam and Sanford Dam.

132.    Defendants are now responsible to compensate the public for the damage they caused the State's natural resources, including the natural resources the State holds in public trust; pay civil fines; repair the damage they caused; and abate the public nuisances created by their malfeasance.

**Defendants fail to comply with the emergency inspection order following the failure of the Edenville Dam.**

133.    The Edenville Dam holds back two rivers:  the Tobacco and Tittabawassee.  It was the Tittabawassee side that failed on May 19, 2020.  The Tobacco side remained intact and holds back a significant amount of water, but the dam's failure has diverted the flow of the Tobacco River, interfered with M-30, and turned the remaining portion of the dam on the Tobacco side into a public safety hazard.

134.    On approximately May 22, 2020, Defendants' staff informed EGLE staff that due to the loss of material around the Tobacco Spillway, slope stability on the Tobacco side of the dam could be a concern if water levels were to rise in a

subsequent storm event; and that cracks had begun to form on the downstream slope west of the Tobacco spillway and, based on observations from Defendants' chief operator Greg Uhl, the cracks were very deep and approximately 60 feet wide.

135.    EGLE staff issued an Emergency Inspection Order on May 22, 2020 that required Defendants to secure an engineer to perform an immediate evaluation of the Tobacco side of the dam and report back by May 24, 2020.  The order also required Defendants to task their engineer with performing a full inspection of the entire dam and making recommendations for repairing any deficiencies that posed a risk to the safety of the remaining dam structure.

136.    May 24, 2020 came and went and Defendants never provided the immediate evaluation required by the order, nor did they otherwise respond to the order.

137.    Defendants placed some material to the slope in an effort to shore up erosion and sloughing in areas of immediate risks, but that work was not done under the supervision of an engineer and it is not clear that the work has adequately stemmed the risk that the dam could fail because Defendants have not provided the evaluation and inspection as previously ordered by EGLE.

138.    On June 2, 2020, EGLE staff reminded Defendant Lee Mueller of the May 22, 2020 order and required compliance by June 3, 2020.  In response, Mr. Mueller did not mention Defendants' obligation to provide the immediate evaluation of the Tobacco side of the dam, but mentioned that he would have an engineer start

29

work on an inspection of the Tobacco side of the dam during the week of June 8, 2020 and would forward the report to EGLE at some point in the future.

139.  Defendants missed not only the May 24, 2020 deadline, but the June 3, 2020 deadline.

140.  On June 5, 2020, Mr. Mueller indicated to EGLE staff that Defendants were monitoring the cracks in the Tobacco side of the dam.

141.  Defendants' failure to comply with the deadlines is unacceptable, as are the efforts they have done to date on the Tobacco side of the dam because the efforts have not been overseen by an engineer and do not provide sufficient assurance that Defendants are protecting the public's health, safety, and welfare.

142.  If the Tobacco side of the Edenville Dam fails, there could be additional catastrophic impacts to the people, property, and natural resources downstream from the dam in addition to the complete loss of the M-30 crossing.  Additionally, people occasionally venture out onto the bottomlands of Sanford Lake despite government warnings, and a sudden deluge could be deadly to those persons.

143.  In response to the May 19, 2020 failure and the ongoing risks posed by the remaining portions of the embankment, the State has expended substantial public resources, including ongoing emergency relief and support, to address the public harm caused by Defendants' malfeasance.

## COUNT I: PART 17 (ENVIRONMENTAL PROTECTION ACT)

144.   All previous allegations are incorporated here.

145.   As explained above, Defendants failure to increase the spillway capacity of Edenville Dam as FERC ordered them to do for more than 14 years caused massive damage to the State's waterways and other natural resources, including the public trust in those resources.

146.   The State seeks an order under MCL 324.1704(1) that requires Defendants to repair the damage the Defendants have caused the State's natural resources and to cease any further destruction of the State's natural resources.

## COUNT II: PART 31 (WATER RESOURCES PROTECTION)

147.   All previous allegations are incorporated here.

148.   As explained above, Defendants' malfeasance caused the discharge of potentially contaminated sediments and other substances harmful to the public health and safety into the waters of the state, and the deposit of unauthorized material onto floodplains.  Those discharges and deposits were in violation of MCL 324.3108 and MCL 324.3109.

149.   The State seeks an order under MCL 324.3115 requiring Defendants to clean up the discharges they have caused, pay civil fines, and pay attorneys' fees and costs.

## COUNT III: PART 301 (INLAND LAKES AND STREAMS)

150.   All previous allegations are incorporated here.

151.    Wixom Lake is an "inland lake or stream" under MCL 324.30101(i).

152.    Defendants' failure to increase the spillway capacity of Edenville Dam "diminish[ed] an inland lake or stream" in violation of MCL 324.30102(1)(d) and deposited unauthorized material on bottomlands in violation of MCL 324.30102(a).

153.    Defendants' malfeasance and mismanagement has decimated the ecosystems of Wixom Lake and Sanford Lake, created mud pits where lakes used to be, and caused the deposit of large amount of unauthorized material on bottomlands.

154.    The State seeks an order under MCL 324.30112 requiring Defendants to pay civil fines, restore the Sanford Lake and Wixom Lake ecosystems to their prior conditions, and clean up the unauthorized material on bottomlands.

## COUNT IV: PART 303 (WETLANDS PROTECTION)

155.    All previous allegations are incorporated here.

156.    There were previously wetlands reliant on Wixom Lake, and by information and belief Sanford Lake, and the drainage of those wetlands without a permit has been caused by the malfeasance of Defendants in violation of MCL 324.30304(d).

157.    By information and belief, the deluge resulting from Defendants' malfeasance also caused the unauthorized deposit of fill materials into wetlands downstream of Edenville and Sanford Dams, in violation of MCL 324.30304(a).

158.   The State seeks an order under MCL 324.30316 requiring Defendants to restore the affected wetlands as nearly as possible to their state prior to the failure of the Edenville Dams and assess civil fines.

## COUNT V: PART 315 (DAM SAFETY)

159.   All previous allegations are incorporated here.

160.   A person shall not alter or abandon a dam except in accordance with Part 315, Dam Safety of the NREPA.  MCL 324.31507(1).

161.   By mismanaging the Edenville Dam to the point that it failed, causing the Sanford Dam to fail, Defendants altered dams in a manner not provided for by law.

162.   If there is a change in a condition that may threaten a dam, EGLE can order an inspection of a dam by a licensed engineer to evaluate, among other things, the structural integrity of the dam, whether there exist deficiencies that may lead to a failure, and make recommendations for repair or alterations to address any deficiencies.  MCL 324.31518.  The failure of the Tittabawassee side of the Edenville dam constitutes such a change in condition.

163.   EGLE can also issue emergency orders if a "a dam is in imminent danger of failure and is causing or threatening to cause harm to public health, safety, welfare, property, or the natural resources or the public trust in those natural resources."  MCL 324.31521(1).  The information to date about the Tobacco side of the Edenville Dam indicates that there is a substantial risk of imminent failure that could cause significant harm to the public and its resources.

33

164.    As noted above, Defendants have not complied with a lawful emergency inspection order issued by EGLE.

165.    The State seeks civil fines, restoration, and other injunctive relief pursuant to MCL 324.31525.

## COUNT VI: CONVERSION

166.    All previous allegations are incorporated here.

167.    The State owns the fish, wildlife, and freshwater mussels whose deaths were caused by the Defendants' malfeasance.  MCL 324.48702(1); MCL 324.40105.

168.    Defendants had a duty not to interfere with the State's property, let alone destroy it.

169.    Defendants knew or should have known that their actions would cause a deluge of water to surge downriver killing fish and wildlife and exposing large portions of the bottomland of Wixom Lake and Sanford Lake, killing aquatic life.

170.    Defendants actions wrongfully exerted dominion over the fish, wildlife, and aquatic life and caused their death, which denies and is inconsistent with the State's rights to them.

171.    Defendants' actions constitute a taking, and it was contrary to law for Defendants to take the State's fish, wildlife, and aquatic life without authorization. MCL 324.48702(1); MCL 324.40105.

172.    The State seeks damages for Defendants' conversion of the State's fish, wildlife, and aquatic life.

## COUNT VII: PUBLIC NUISANCE

173.    All previous allegations are incorporated here.

174.    Defendants' actions have created a public nuisance because the general public has a common right to be free from the deluge and destruction caused by the failure of the Edenville and Sanford Dams, and also to enjoy and benefit from the natural resources that are part of the Wixom Lake and Sanford Lake ecosystems.

175.    Defendants' actions have unreasonably interfered with those common rights because they have caused massive damage to public property and infrastructure downstream from Edenville Dam; wrecked homes and businesses; effectively destroyed the ecosystems of Wixom and Sanford Lakes; transformed the remaining portion of the dam into a public safety hazard; diverted the flow of the Tobacco River resulting in erosion; and damaged and threatened the existence of M-30, an important road in the region.

176.    Defendants' actions have also unreasonably interfered with that common right because they are proscribed by law.  As alleged above, Defendants actions have violated Parts 17, 31, 301, 315, 401, and 487 of the NREPA.  Each of those parts are laws passed to preserve the public welfare.

177.    Not only have Defendants created the public nuisance by their actions, but the nuisance emanates from land they own or control.

178.    The State seeks an order requiring the abatement of the public nuisance by repairing and restoring the damage caused by the failure of the Edenville and Sanford Dams, and forbidding Defendants from further harming public rights.

## COUNT VIII: UNJUST ENRICHMENT

179.   All previous allegations are incorporated here.

180.   By common law and the principles of justice, a person may not be inequitably enriched by receiving a benefit at another's expense.

181.   The principles of unjust enrichment are violated where a party steps in to address a duty owed by another to the public to protect the public from an urgent threat to their health, safety, or general welfare and pays expenses that rightfully should have been paid by the other person.

182.   Defendants had a duty to protect the public, and their actions violated that duty, resulting in a flood that has created ongoing harms to the public's health, safety and welfare.

183.   To address the public's harms Defendants caused, the State has expended and continues to expend considerable public resources.

184.   Defendants received a benefit from the State because they have been temporarily relieved of their obligations to address the threat to public health, safety and welfare that they were otherwise obligated to address.

185.   The principles of justice and established common law require Defendants to reimburse the State for performing a duty to the public that was properly owed by Defendants.

## RELIEF REQUESTED

As explained above, the State seeks the following:

a.   A money judgment exceeding $25,000;

b.      A declaration that Defendants violated Parts 17, 31, 301, 303, 315, 401, and 487 of the NREPA, as well as the common law doctrines of conversion, public nuisance, and unjust enrichment;

c.      Civil fines;

d.      A declaration that Defendants' violations of the common law and NREPA have created an ongoing public nuisance and an order requiring the abatement of the public nuisance;

e.      A declaration that Defendants have been unjustly enriched by being temporarily relieved of their obligations to address the public harms they have a duty to address, and an order requiring Defendants to reimburse the state the expenses the State has made to fulfill the duty owed by Defendants;

f.      An order requiring Defendants to restore and repair the damage they caused;

g.      The relief authorized by MCL 324.1704, MCL 324.3115, MCL 324.30112, MCL 324.30316, and MCL 324.31525;

h.      An order reimbursing the State's enforcement expenses, including litigation expenses and attorney's fees;

i.      Any other relief the Court considers appropriate.

## VERIFICATION

I declare under the penalties of perjury that this complaint has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

/s/ *James Dexter*
James Dexter, Fisheries Division Chief, Michigan Department of Natural Resources

I declare under the penalties of perjury that this complaint has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

/s/ *Teresa Seidel*
Teresa Seidel, Water Resources Division Director, Michigan Department of Environment, Great Lakes, and Energy

Respectfully submitted,

Dana Nessel
Attorney General

/s/ *Nathan A. Gambill*
Nathan A. Gambill (P75506)
Danielle Allison-Yokom (P70950)
Assistant Attorneys General
Attorneys for Plaintiffs
Michigan Department of Attorney General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
gambilln@michigan.gov
allisonyokomd@michigan.gov

Dated: June 9, 2020

LF: Lee Mueller and Boyce Hydro (EGLE)/AG# 2020-0291918-B/Verified Complaint 2020-06-09